HAGTHORP *et ux. et al. vs.* HOOK's Adm'rs D. B. N.—*December,* 1829.

In a cause which had been set down for hearing, the Chancellor, after argument of counsel, proceeded to discuss many rules and principles of equity, and a great variety of facts, as applicable to the subject under consideration; and announced his intention at some future day to decree accordingly. To enable him to do so, he referred the cause to the auditor, to state an account in conformity to his views, from the proceedings, and proofs then in the cause, or from such other proofs, as might be adduced by the parties, which they were respectively authorised to introduce upon notice, before a given day. In this state of the cause, an appeal was taken ; and upon a motion to dismiss it, HELD, that the order in question did not so settle, or materially affect,

all, or any of the rights, or interests in controversy, as to make it a decretal order, from which an appeal would lie;—that it was a mere preparative, to the decision of the cause, and not *decretal;* and that it was only from what the Chancellor had done, that is, adjudged, or decreed, and not from what he intends to do, that an appeal would lie.

A, by deed, conveyed certain real and personal chattels to I, upon the proviso, that if I, his executors, &c. should absolutely omit, neglect and refuse to pay certain creditors of A, recited in the deed, their just demands, then the deed should be void. This property came to the hands of I, and after his death, passed to his administrators and the other defendants claiming under him, and them. Upon a bill filed by the administrator *de bonis non* of A, praying that the property may be accounted for, and together with the rents and profits delivered up, it appeared that some part of the chattels real was still in the hands of I's representatives, some claimed by those who had purchased with a reference to the original conveyance, and the residue by those who offered no proof of being purchasers for value without notice. The Chancellor decreed that the deed would be considered a mortgage, and nothing having occurred to destroy its redeemable quality—but one of A's creditors having been paid, directed the auditor to state an account, in which I's representatives must be charged with the value of the whole of the personal chattels, and interest thereon, from the date of the deed from A to I; and with the rents and profits of the real chattels from the same date, and until the time when they passed into the hands of the other defendants ; who were responsible during the time they respectively had possession. And that I's representatives would be held liable for all rents, and profits, which the other defendants should fail, or be unable to pay, giving them credit for the debt paid. PER BLAND, CHANCELLOR.

According to the law of England, an administrator *de bonis non,* cannot call the representatives of the previous deceased administrator of his intestate to account, for any property of the intestate that such predecessor may have converted or wasted ; nor can he claim or recover any thing, but those goods, chattels and credits of his intestate which remain in specie, and are capable of being clearly and distinctly designated and distinguished as the property of the intestate. IB.

In equity, an executor or administrator, is considered as a trustee of the creditors, legatees and next of kin of the deceased ; is expected and required to preserve the property of the deceased apart from his own ; and if he does so, the court will do every thing that can be done to protect and assist him. IB.

The only remedy at present against an administrator or his representatives, for any waste or misapplication of the effects of the deceased, is by an action at law upon his administration bond, by any one interested. IB.

The authority conferred by letters of administration *de bonis non* by our law, is to administer all things described in the act of Assembly as assets, not

Hagthorp *et ux. et al. vs.* Hook's Adm'rs D. B. N.—1829.

converted into money, and not distributed, delivered, or retained by the former executor or administrator, under the direction of the Orphan's Court ; and such an administrator can only sue for those goods, chattels and credits, which his letters authorise him to administer.      IB.

The legal title to the chattels real, and personal estate, of an intestate, vests in his administrator, who alone is considered as to them his legal representative; between the death, and the granting of letters, that title is suspended and vested in no one.      IB.

In the construction of the statute of distributions, it has been held, that although the creditors of the deceased are the first and special objects of its regard ; yet that the next of kin, among whom the surplus is to be distributed take an interest which vests in them, by operation of law immediately, in the nature of a present debt of an unascertained amount payable at a future day; and it is clear that they can only obtain possession of their distributive share, through and from the administrator.      IB.

When the general replication is put in, and the parties proceed to a hearing, all the allegations of the answers which are responsive to the bill, shall be taken for true, unless they are disproved by two witnesses, or by one witness with pregnant circumstances.      IB.

Every allegation of the answer which is not directly responsive to the bill, but sets forth matter in avoidance, or in bar of the plaintiff's claim, is denied by the general replication, and must be fully proved or it will have no effect.      IB.

If a defendant submit to answer at all, he must answer fully, and particularly, not merely limiting his responses to the interrogatories of the bill ; but respond to the whole and every substantial part of the plaintiff's case: he is not however bound to go further and to answer interrogatories asking a disclosure of matter, no way connected with, or material to the case.      IB.

When the answer in the body of it, purports to be an answer to the whole bill, but the respondent declares, that he is entirely *ignorant of* the matters contained in the bill, and leaves the plaintiff to make out the best case he can, or uses language to that effect; and the plaintiff files the general replication, all the allegations of the bill are thus denied, and put in issue ; and consequently all of them must be proved at the hearing.      IB.

The rule in relation to trusts by implication, or, operation of law, is by no means so large, as to extend to every mere voluntary conveyance.      IB.

Where the nature of the transaction charged in the bill, is such a one as must have been altogether within the knowledge of the intestate, the administrator may answer as he is informed and verily believes, but the answer of an administrator must always be taken, as well with a reference to the reason given for his belief, as to the nature of the subject of which he speaks.      IB.

A purchaser for a valuable consideration without notice will not be disturbed in equity.      IB.

A purchaser with a knowledge of the trust becomes himself the trustee, and stands in the place of the vendor, under whom he claims.      IB.

A purchaser with notice, from another purchaser without notice, may protect himself by the want of notice in his vendor.

When a purchaser cannot make title, but by a deed which leads him to a knowledge of the fact; and more especially, when the deed by virtue of which he takes, recites, or directly refers to the instrument, in which the trust is declared, or from which it arises, he shall be deemed cognizant of the fact, and a purchaser with notice. Iʙ.

Under the head of just allowances, it has long been the course of this court, to allow a trustee or mortgager in possession, for all necessary expenses incurred for the defence, relief, protection and repairs of the estate. And when a mortgager thinking himself absolutely entitled, had expended considerable sums in repairs and lasting improvements, he should be allowed the value of them. Iʙ.

The estimate of the value of such lasting improvements, is to be taken as they are, at the time of accounting, or passing the final decree; and in charging rents and profits the estimate must not include those arising exclusively from such improvements. Iʙ.

This was an appeal from Chancery. The bill was filed by *James Neale,* administrator *de bonis non* of *Anthony Hook,* and claimed payment for certain personal, and an account of the rents and profits of certain leasehold property, which the said *Anthony* in his life time had conveyed in trust to *John Hook,* deceased, and which was alleged to be in the possession of the representatives of *John Hook,* viz. *Edward Hagthorp and wife,* and other defendants, purchasers from the said *John* or his representatives. The complainant claimed the property for the purpose of distributing it according to law, and charged the defendants with confederating to prevent that object. Answers were filed, testimony taken, and the cause set down for hearing. But as the merits of the case were not reviewed by the appellate court, the appeal having been dismissed as prematurely taken, on the motion of the appellees; it is deemed unnecessary to publish more than this brief notice of the proceedings, and to refer to the opinion of the chancellor which follows for the material facts of the cause, and to which his opinion is applied.

BLAND, Chancellor, December Term, 1826.

This case standing ready for hearing, and the counsel on both sides having been fully heard, the proceedings were read and considered.

This suit is brought by *James Neale*, alone, as administrator *de bonis non* of the late *Anthony Hook*: and, from the pleadings and proofs, it appears, that the intestate, *Anthony Hook*, died in June, 1798: that in the month following, administration on his goods, chattels and credits, was granted to his son, *John Hook*, who died in September, 1800: that in the month of November following, administration *de bonis non* of the personal estate of the late *Anthony*, was committed to his widow, *Mary Hook;* who died sometime after the year 1804: and, that on the 5th of April, 1820, administration *de bonis non* of all the goods, chattels and credits of the late *Anthony*, was granted to *James Neale;* who, as such, on the 15th of December following, instituted this suit.

According to the law of *England*, an administrator, *de bonis non*, cannot call the representatives of the previous deceased administrator of his intestate to account, for any property of the intestate, that such predecessor may have converted or wasted; nor can he claim or recover any thing but those goods, chattels, and credits of his intestate, which remain in specie, and are capable of being clearly and distinctly designated and distinguished as the property of his intestate. 3 *Bac. Abr.* 19, 20. Hence, it is, that, in a Court of Equity particularly, an executor or administrator, who is there considered as a trustee for the creditors, legatees, and next of kin of the deceased, is expected and required to preserve the property of the deceased apart from his own, and by itself to give it, as is said, an ear mark, that it may be always known and readily traced to any one, into whose hands it may happen to fall: and if he does so the court will do every thing that can be done to protect and assist him. 3 *Mer.* 42, *Salk.* 306.

According to our provincial testimentary system, an administrator *de bonis non* might, under certain circumstances, have had his predecessor cited before the commissary and compelled to account. 1715, *ch.* 39, *sec.* 3. *Dep. Com. Guide*, 55, 57. But at present, the only remedy against an administrator or his representatives, for any waste, or misapplication of the effects of the deceased, is, by an action at law upon his administration

bond by any one interested. For, it is expressly declared by our present law, that the authority conferred, by letters of administration *de bonis non*, shall be to administer all things described in the act as assets, *not converted into money, and not distributed or delivered, or retained by the former executor or administrator, under the direction of the Orphan's Court,* 1798, *No.* 101, *ch.* 14, *sec.* 2.

Hence, it follows, that this plaintiff is incompetent to demand, in the representative character, in which he sues, any thing, but those goods, chattels and credits, which his letters authorise him to administer; that is, the chattels real and personal property of his intestate, which remain undisposed of by either of the previous administrators, *John* or *Mary;* or which have been, and continue to be held unaccounted for by any one, as trustee or agent of the late *Anthony Hook,* his intestate. The statements and allegations of these very obscure original and amended bills, must, therefore, be taken subject to the limited rights of the representative character of this plaintiff.

It appears, from the pleadings, in this cause, that some of the next of kin, and distributees of the late *Anthony Hook,* under an impression, that the chattels real of the deceased, had vested absolutely in them, have disposed of, or attempted to make a final disposition of the whole, as if such chattels had been immediately cast into their hands by the mere operation of law: in like manner as the real estate of an intestate, is at once cast upon his heirs. If these next of kin acquired, at once, by the act of the law alone, a legal right to these chattels real, by virtue of which they might, either concurrently or independently of the administrator, dispose of them, then, as the joint or independent holders of the property in controversy, they ought to be made parties to this bill; and if they have acquired such a legal right, and have actually disposed of these chattels, then, it is no less evident, that all claim against these defendants is, so far, entirely at an end. In these points of view the allegations of the bill, in relation to these next of kin, of the intestate, present some important preliminary enquiries.

The real estate of an intestate, devolves at once and entirely, upon his heirs, by the mere act of the law itself. But his personal property is, by the law itself, cast upon no one; nor does the legal ownership of it vest, immediately, in any person. Because, such legal title can only vest in an administrator; who alone, is considered as the legal representative of the intestate, as to his chattels real, and personal estate. In the interval of time, between the death of the intestate and the granting of administration, the legal right to such personal property is in suspense, or in the keeping of the law, and vested in no one. During that interval, there is no person who can sue or be sued for it; and, hence, it has been held, that a person who had, after the death of the intestate, obtained possession of his personal property, could not have it quieted or matured into a right, by the lapse of any length of time, even as much as forty years uninterrupted possession, before the granting of letters of administration; because, the statute of limitations could not be allowed to operate at all, until the legal title was vested in some one; and there was a person lawfully clothed, with a capacity to sue for, hold and dispose of such property, 4 *Bac. Abr.* 479, *Salk.* 421.

Our statute of distributions, like that of England, 3 *Bac. Abr.* 72, directs the goods, chattels and credits of those, who die intestate, to be committed to an administrator, whose powers and duties are prescribed. He has a vested interest in the personal estate of the deceased, 1 *P. Will.* 43: and is directed to collect and take the whole of it into his possession, which, or the proceeds of the sales thereof, he is, in the first place, to apply to the satisfaction of all the debts due from the intestate, and then, but not until then, he is to distribute the *surplus* among the next of kin of the deceased. In the construction of this statute, it has been held, that although the creditors of the deceased are the first and special objects of its regard; yet, that the next of kin, among whom the *surplus* is to be distributed, take an interest which vests in them, by operation of law immediately. It is considered as a species of *chose in action* of an indefinite value: in nature of a present debt, of an unascertained

amount payable at a future day, 3 *Mod.* 59.   1 *Show.* 2, 25.
2 *Show.* 407.   *Pre. Cha.* 21. 1 *P. Will.* 380.   4 *Ves.* 665.   This
interest vests in those who are the next of kin of the deceased
at the time of his death: not, however, in exclusion of a posthu-
mous child, who is regarded as a then living though unborn
distributee, and therefore, should any of them die before the
distribution of the *surplus* is actually made, his share will not
be sunk into the estate of the intestate: but go to his own legal
representatives in like manner as his other personal property,
*Dep. Com. G.* 114.   2 *P. Will.* 446.

Hence, it is clear, that in no case, nor under any circum-
stances, can any one as next of kin of the intestate, rightfully
and legally make title to, or obtain possession of his distributive
share, but through and from the administrator: who, in equity,
is regarded as a trustee for creditors and the next of kin; and
as such may, in Chancery, be called to account by all or any of
them, 1 *H. & I.* 151.   5 *Ves.* 743.   And every one who takes
possession of personal property of an intestate, after his decease,
may be sued at law by a creditor as an executor *de son tort,*
and charged accordingly; and in equity, he will be considered
as a trustee, and held accountable to the administrator, no
matter how long he may have had possession, before the admi-
nistration was granted. 2 *Rand. Rep.* 397.   2 *Desan.* 232.   The
utility and necessity of having all the personal estate of a
deceased, placed in the hands of an administrator, and the prin-
ciple of law that neither a creditor, nor a distributee of an
intestate could obtain any right to the personal estate of the
deceased in any other manner, than from an administrator, has
been very strongly recognized by the legislature more than a
century past.

By the act of 1719, *ch.* 14, *sec.* 7, it is declared, that many
widows, or others having the deceased's effects in their hands,
*and right to the administration thereof,* designedly suffer other
persons to administer, whose mouths are easily stopped, with
part of the estate's being delivered to them, and bring only such
part of the appraisement to the great dishonour of the deceased,
and deceit of the living; for prevention whereof, as well as of

frequent tedious suits, for the detecting such concealments, it is enacted, that the court may, in a summary way, cite such persons before it, and examine, and decide on the matter. Here the distributees, the widow and others, having a right to the administration, who are the next of kin, are specially designated, and it is expressly declared, that they shall not retain, or hold any of the personal estate of the deceased: and if they do conceal any of it, they are made liable in a summary way as wrong doers.

If the law were otherwise; and if each creditor, and every one next of kin, were allowed to help himself, to what he thought his due; to seize upon, and, in any manner by his own act alone, acquire a legal right to the personal property of the intestate; the greatest confusion would ensue, and the most monstrous frauds might be perpetrated; no letters of administration would be taken out, in any case; but on the death of every one who had left any personal estate, worth contending for, a disorderly scramble would take place; and those residents at a distance, infants, and all others who were unable to take care of their own interests, would be openly and wantonly defrauded, as this venerable act declares, "to the great dishonour of the dead and deceit of the living." Such a course could not be tolerated in any shape or for an instant.

Hence, the indispensable necessity in all cases of a regular administration, and of compelling all, as well creditors, as next of kin, to resort for the payment of their claims and distributive portions, to an administrator. In this case, it is not pretended, that these next of kin of *Anthony Hook,* obtained any thing, any right whatever from his administrators; consequently, having derived no right from either of the administrators; and none having been cast upon them by mere operation of law: they never had the power, in any manner, legally to dispose of any of the personal estate of the deceased; or to do any act which could at all affect the rights of the present plaintiff.

Leave was asked and obtained on the 7th of February, 1823, to make *James Hook,* the son of the late *John Hook,* a defendant; who, on the same day, filed his answer to the

amended bill; and in a kind of amended or duplicate bill, filed on the 23d of July, 1824, *James Hook*, is once incidentally spoken of as a defendant; no process was ever prayed against him; but by an agreement, filed on the 4th of November, 1826, he is admitted to be a party defendant. This person is no otherwise noticed in the proceedings; no charge, whatever, has been made against him; nor does it appear that he can, in any degree, be made liable for any part of the subject in controversy; either in his individual capacity, or as heir, or next of kin of his father, the late *John Hook*, or of his grandfather the late *Anthony Hook*. The presence of this defendant, *James Hook*, it appears to be in no way necessary; and, therefore, I shall, for the present, take no further notice of him.

The bills, through a considerable portion of them, seem to consider the next of kin and distributees: or, as it calls them, in relation to these chattels, *the heirs of* the late *Anthony Hook*, to be in some way or other parties to this suit: but they have neither been made plaintiffs, nor defendants as such; and therefore, all that has been said, or proved about them, and their agreements, must be rejected as mere surplusage, and entirely foreign to the matter now under consideration. *William Mc-Mechen*, a defendant, says, he answers "the bill of complaint of *James Neale* and others, representatives of *Anthony Hook*, deceased:" and in the body of his answer, he says, "during all which time several of the complainants resided in the neighbourhood of the said land:" others of the answers seem to have an eye to some other complainants, besides *Neale*. These respondents appear, in this respect, to have turned their attention to some of the irrelevant circumstances related in the bill, without sufficiently regarding its substance. But all such expressions and allusions, in the answers, must, in like manner, be rejected as surplusage.

So much as to the excrescences, the foreign matter, and mere careless verbiage of the bill, and some of the answers. But, before we can proceed to consider the merits of the case, it will be necessary to ascertain from these pleadings, as accurately as practicable, what is the matter as to which the parties

are at *issue;* and what part of the allegations of each had been admitted, taken for true, or is to be sustained or combatted by proof. In relation to these matters it will be necessary to explain, recollect, and apply some of the general rules in relation to answers.

The *first* of these general rules, which have a bearing upon this case is, that where the general replication is put in, and the parties proceed to a hearing, all the allegations of the answers, which are responsive to the bill, shall be taken for true; unless they are disproved by two witnesses, or by one witness, with pregnant circumstances. The answer to this extent is considered as evidence, and conclusive, unless disproved; even although the defendant may have a direct and palpable interest in establishing the truth of what he advances. 3 *Wheat.* 527. An answer is only so far responsive as it answers to a material statement, or charge in the bill, as to which, a disclosure is sought; and which is the subject of parol proof; but no further. Where a deed, or instrument of writing is necessary to establish any right, and the bill enquires for the evidence of such right, the answer, unaccompanied and unsupported by such deed or writing, will be no evidence, although it should directly respond to the bill; because the answer is only in the nature of parol evidence; and in such case, evidence of a higher grade is required by law. 5 *Harr. & Johns.* 381.

But where the bill asks for the production of evidence, which from the nature of the plaintiff's case, he has a right to claim, that may be necessary and useful to him in other cases beside the one then under consideration; an answer to such a bill is not responsive, which merely asserts the facts without saying any thing of the evidence of its existence, or the means of obtaining it. And, where a defendant, by his answer, asserts a right affirmatively in opposition to the plaintiff's demand, he must establish it by proof; or the assertion will be disregarded: for, a defendant cannot be permitted to swear himself into a title to the plaintiff's estate. 1 *Wash.* 225. 1 *Mun.* 395. 2 *John, C. Rep.* 87. 2 *Ev. Poth.* 157. But where an administrator is called upon to answer certain matters, which appear to

have rested exclusively within the knowledge of his intestate, it will be sufficient that he swears as he is informed and believes; *Carnan, Ex'rs vs. Vansant's administrators,* 1807, *M. S.,* but such an answer is to be taken with reference to the reasons given for his belief; for, if the reasons are futile, and especially if the alleged belief be in a high degree irreconcileable with the admitted, or established circumstances of the case, the answer cannot be credited: nor be allowed thus loosely to swear away the equity of the bill. *Tong. vs. Oliver and others,* 1809, *M. S.* 9 *Can.* 160.

A *second* general rule is, that every allegation of the answer, which is not directly responsive to the bill, but sets forth matter in avoidance, or in bar of the plaintiff's claim, is denied by the general republication, and must be fully proved, or it will have no effect.

A *third* general rule is, that, if the defendant submits to answer at all, he must answer fully, and particularly: not merely limiting his responses to the interrogatories of the bill: but respond to the whole and every substantial part of the plaintiff's case. 1 *John, C. Rep.* 75, 107. He is not however, bound to go further, and to answer any interrogatory asking a disclosure of matter no way connected with, or material to the case. If the answer be in any respect evasive, or insufficient, the plaintiff may except to it; and thus extract from his opponent a full and perfect answer. But to this general rule there is a modification, the nature and bearing of which may be sufficiently illustrated by one or two instances: a defendant to a bill of discovery, answered a portion of it, and as to all the other matters therein set forth, he answered and said, that he had no other knowledge of them, than what he had obtained confidentially as counsel; and therefore declined answering further: this answer was deemed sufficient; and again a defendant answered as to part, and as to the residue relied upon the statute of limitations: this answer was also held to be sufficient. In such cases, a part of the answer performs the office of a plea; and the defendant thus makes defence to the whole case, by a disclosure of all the facts so far as he is bound *so to respond;* and for the residue, by presenting such an

equitable bar to the plaintiff's claim, as is a sufficient excuse for not answering *in the manner required by the bill.* The exact compass of this *modification* of the rule, that if a defendant submits to answer at all, he must answer fully, remains yet to be adjusted. 2 *Mad. Ch.* 339. Much has been said upon the subject; but as the cases in relation to this "distracted point," as it has been called, have no bearing upon the case now under consideration, they have been thus generally noticed merely to prevent misapprehension.

A *fourth* general rule, is one which grows out of the *third* rule, that exacts a full answer: and requires to be attentively considered in this case: it is, that where the defendant fails to answer any of the material allegations of the bill, such unanswered allegations shall, at the hearing, be taken to be true. (a) Thus were the bill demands the delivery of two pieces of property, and the answer makes defence as to one, but is totally silent as to the other. In such case according to this rule, the bill may be taken *pro confesso* for that, as to which the answer is silent; and the plaintiff may obtain a decree accordingly. The propriety of this rule has, however, been questioned; and therefore it stands in need of all the support it can derive from authority, reason, and analogy.

If, upon exceptions, the answer is held to be insufficient, the defendant will be ordered to answer more fully: and if he fails to do so, in England, sequestration will go against his estate. The plaintiff need not, however, stop there, but may proceed to have his whole bill taken *pro confesso;* for the court is in the habit of considering an insufficient answer as no answer. 2 *Atk.* 21. 3 *Ves.* 209. 1 *V. and B.* 367. 2 *Ves. and B.* 258. In this state, obedience to the order directing a more perfect answer, upon exceptions being sustained, is usually enforced by attachment; but, as in England, on the defendant's failing to answer as ordered; and the process of attachment failing to coerce an answer, as required, the whole bill may be taken *pro confesso.* 3 *Ves.* 372 209; so, where the defendant had answered, and the

(a) The fourth general rule above stated has been denied by the appellate court in the late case of *Warfield vs. Cambrill.*

plaintiff then amended his bill, introducing new matter, he is entitled to an answer to such new matter; because, an amended bill is a part of the original bill, and the defendant's answer thereto is a part of his original answer; and consequently, the defendant is as much bound to answer the amended bill, as to answer each portion of the original bill itself. Therefore, if he fails to do so, the plaintiff may proceed, according to the course of the court, and have his whole bill taken *pro confesso. 4 Ves.* 619. *3 John. C. Rep.* 410. For, as it has been said, if the plaintiff should not be entitled to such a decree under those circumstances, then the authority of this court would be very defective and the justice of it might be eluded. *2 Eq. Ca. Ab.* 179. *1 Har. Pr. Ch.* 277. *2 Atk.* 21.

A plea is a special answer to a bill, differing in this from an answer in common form, as it demands the judgment of the court, in the first instance, whether the special matter urged by it, does not debar the plaintiff from his title to that answer, which the bill requires: but where, from the matter set forth in the bill, an answer is required to support a plea, it will be overruled without such an answer; upon the ground, *that the matters not thus answered are taken for true.* As where the bill sets out a claim arising on a mortgage made more than twenty years before the institution of the suit, and then goes on to shew, that there have been such partial payments, or recent acknowledgments, as would take the case out of the statute of limitations, were it pleaded. In such case, a plea of the statute of limitations must be supported by an answer, denying such partial payments and recent acknowledgments; for, otherwise, those circumstances, not being denied by the plea, would be taken for true, if not denied by way of answer; and would show, that the case had been taken out of the statute. *2 Scho. & Lef.* 725.

These authorities appear satisfactorily to sustain this rule; and to shew, that the defendant cannot be allowed, with impunity or advantage to himself, to refuse to answer at all; or, in any manner or form, to stop short, or to omit to answer any ma-

terial part of the plaintiff's case: and, that the consequence of such a refusal or failure, is, that the whole bill, or so much of it as remains unanswered, may, at the hearing, be taken *pro confesso.*

The proceedings in Chancery have been formed according to the course of the civil law, in some respects; and analogous to the common law in others; and, as to all matters of substance, there must be the same strictness in pleading in equity, as in law. *Mit. Pr. 232.* Hence, it is not unfrequent, where a case arises, as to which former decisions furnish no safe guide, to have recourse to the illustrative analogies of the common law. 2 *Atk.* 21. 3 *Atk.* 589. 6 *Ves.* 594. 9 *Ves.* 55. 11 *Ves.* 292. Supposing, then, that in relation to this subject, there was a total absence of all manner of precedent and authority, the analogous course of the common law will be found to afford much and strong light.

At common law, there are two defaults; the one before, and the other after appearance. The consequence of the first, in England, is, that the defendant may be outlawed; and in this State, in many cases, is, that an attachment may go against his estate. The consequence of the second default, or the defendant not putting in any plea at all, is, that the plaintiff may have a judgment by *nil dicit.* The plea is called, at common law, the answer of the defendant: and, if he fails to answer, judgment is awarded against him on the ground, that he has thus tacitly admitted, or confessed the case of the plaintiff, and left him nothing to litigate or to prove. So, in equity, after an appearance, the taking a bill *pro confesso,* where no answer has been put in, or no sufficient answer, after exceptions have been sustained, is analogous to the taking the declaration for true, where the defendant has put in no plea at all, or it has been held insufficient on demurrer. 2 *Atk.* 21.

It is a rule at common law, that every plea must answer the whole declaration, or at least every material part of it, which goes to constitute the gist of the action. But, the defendant may fail, or purposely decline to plead, or answer to every part of the declaration: in which case the plaintiff may join issue

on the plea, and take his judgment for the unanswered part as by *nil dicit.* And we are told, that it is frequently judicious to plead only to part, or to admit a part of the cause of action in order to save the costs of the trial of such matter: for, nothing can be tried, that is not put in issue; and the defendant, by declining to answer a part, deprives the plaintiff of the power to burthen him with the costs and expense of proving that, on a trial, which he has not denied, and put in issue. 1 *Chit. Plead.* 509. So, in equity, where the defendant fails, or declines answering any material part of the plaintiff's bill, as to which he seeks, and may obtain relief, it amounts to a tacit admission of so much: and, such part of the bill may, therefore, be taken *pro confesso:* and, if the declining to answer a part of the cause of action may, from any motives, be judicious at common law, certainly a defendant in Chancery may be induced for like reasons to pursue a similar course; since no costs, or expense, can be allowed in Chancery, any more than at law, for the proof and trial of any matter not put in issue. 2 *P. Will.* 557. 19 *Johns. Rep.* 505. 2 *Desan.* 172. Upon the whole, this rule in relation to pleadings in equity, appears to be as fully sustained by analogy to the course of the common law, as by direct and positive authority.

There is, in many instances, a strong disposition manifested by courts of Chancery to harmonise their proceedings, in principle, with the positive rules of the common law. But, where the Legislature have prescribed rules of proceeding for the court itself; and cases occur within the *spirit,* but not within the *letter* of them, the Chancellor feels himself, not merely invited, for the preservation of harmony, but becomes sensible of a duty to conform, upon the ground, that equity is bound to follow the law in *spirit* and in *principle.*

In equity, the consequences of a default before appearance, when pursued to the utmost, seldom enabled the plaintiff to obtain the precise relief he was in quest of; because, there could be no adjudication upon his case, applying the remedy, as specific performance, or the like, exactly to suit it, until the defendant had appeared, and the allegations of the bill had been

taken for true or established. The English courts, evidently under a strong sense of the necessity of their being some better mode of attaining justice, than by a sequestration of the defendant's estate, have carried the doctrine, in relation to substituted and constructive summons, full as far as was within the compass of judicial power; further than it ever was in this State; and yet, short of the point of manifest and general utility. In the year 1718, the Legislature partially interposed, and by the act of 5 *Geo.* 2, *ch.* 25, provided the means of enabling a plaintiff to proceed against a defendant, who had not entered his appearance, and have his bill taken *pro confesso;* which could not be done in equity until then. 2 *Atk.* 23. This statute was introduced and used in this state, *Kil. Rep.* 189, and seems to have been the original settler among us; whence sprang that numerous family of legislative enactments upon this subject, to be found in our statute book, from the year 1773 down to the present time.

The following is a list of the acts of Assembly under which a bill may be taken *pro confesso* against a defendant, who has not been summoned nor has appeared: 1773, *ch.* 7, *sec.* 3. 1785, *ch.* 72, *sec.* 30, 31. 1787, *ch.* 30, *sec.* 1. 1790, *ch.* 38, *sec.* 3. 1792, *ch.* 41, *sec.* 2, 4. 1794, *ch.* 60, *sec.* 2, 3, 5, 9. 1795, *ch.* 88, *sec.* 1, 2. 1797, *ch.* 114, *sec.* 2, 3. 1799, *ch.* 79, *sec.* 3, 4. 1804, *ch.* 107, *sec.* 2. 1820, *ch.* 161. These acts provide for all the cases that have, or, as it is supposed, can occur; absent or absconding defendants; non-resident defendants, who are either *non compos,* infants, or adult; absent or non-resident mortgagers; defendants who evade the service of the *subpœna;* the case where there are two or more defendants, of one or some of them being non-residents; the case of a bill of revivor, where the party had removed out of the State, &c. And where a party had been returned summoned, but had failed or refused to appear and answer, the acts of 1785, *ch.* 72, *sec.* 1, 9. 1799, *ch.* 79, *sec.* 1, 2. 1820, *ch.* 161, provided that the plaintiff may, according to a prescribed mode, have his bill taken *pro confesso.*

According to the course of the English court, there are cases in which an implied confession is held to be a sufficient ground

for a decree: as where the defendant appears, and has been attached for not answering, and is brought three times from prison into court, and has the bill read to him, and refuses to answer; such public refusal in court amounts to a confession of the whole bill. So too, where a person appears and departs without answering, after which process has gone against him to sequestration, there also the bill is taken *pro confesso;* because, it is presumed to be true when he has appeared and departs in despite of the court, and withstands all its process without answering. *For. Rom.* 36. But, these modes of having a bill taken *pro confesso*, having been deemed in many respects too oppressive, or unnecessarily tedious, 1 *John. C. Rep.* 8, more easy and expeditious modes have been provided by the acts of 1785, *ch.* 72, *sec.* 20. 1779, *ch.* 79, *sec.* 2, 9; and 1820, *ch.* 161, *sec.* 1. By these acts, if a defendant, who has appeared, fails to demur, plead, or answer, according to the rules of court, within a limited time, the bill may be taken *pro confesso.*

At law, where the nature and amount of the plaintiff's demand may be distinctly ascertained from the declaration, as in debt assumpsit, upon a promissory note, or the like, the judgment by *nil dicit*, is final; but in actions for the recovery of damages only, it is not so; because the amount claimed is uncertain; and, therefore, an enquiry must be made, and proof heard as to the quantum which the plaintiff is entitled to recover. Suits in equity are susceptible, in some degree, of a similar classification; and, hence it is, that several of our acts of Assembly, which allow the bill to be taken *pro confesso*, go on to declare that the Chancellor may, *in his discretion*, order a commission to issue for the plaintiff to examine witnesses to prove the allegations of his bill; or the plaintiff may himself be examined on oath. But in some of these acts such a provision was omitted; and hence, by the act of 1799, *ch.* 79, *sec.* 5, it is said to appear unreasonable, that, in any case whatever, the Chancellor should be directed absolutely to take the bill or bare allegations of a suitor *pro confesso;* and, therefore, enacts that, in all such cases, it shall be at the *discretion* of the Chancellor, either to take the bill *pro con-*

*fesso,* or to direct a commission for taking depositions *exparte:* which law, as amended by the act of 1818, *ch.* 193, *sec.* 6, 5, has enabled the Chancellor to call for proofs and explanations in all cases which appear to require it.         •

These, then, are the legislative rules in regard to the *whole bill,* where no answer at all is put in.     But not one of these acts of Assembly which seem to have provided, with such an infinite deal of care and solicitude, for all the various causes and modes of neglecting or failing to answer the *whole bill,* do, in any manner, speak of, or allude to the case of a neglect or refusal to answer a distinct or material *part* only of the bill: where an answer is made to all the rest.   The act of 1795, *ch.* 88, *sec.* 1, says, the bill may be taken *pro confesso,* and the Chancellor shall proceed to decree in the same manner, as if the defendant had admitted by his answer the facts stated in the bill; and in case the defendant has been summoned, or has appeared, and fails to answer, he must be ordered to do so, by an appointed day ; or an interlocutory decree may be entered on the default, and a commission issued *exparte:* but, in every case the consequence of the default is, that the bill may be taken *pro confesso.*

Hence it appears to be clear, that these legislative rules which, according to their *letter,* are only applicable to the case where there is no answer at all, must, in *spirit and principle,* be alike applicable to the case where the answer only covers a *part* of the material allegations, and is totally and absolutely silent as to the residue of the bill ; and, consequently, according to the principle and spirit of these legislative rules, the unanswered part of the bill must, on the hearing, be taken to be true ; otherwise, there would be a manifest inconsistency in the course of the court: and although a party might have a right to relief in Chancery, and be entitled to an answer to every allegation in his bill, necessary to sustain his claim to relief: if the defendant failed or refused, to answer them all, he might have his bill taken *pro confesso*; yet, if he failed or refused to answer a part of those allegations for such part unanswered, he must pursue a different course.     But the reason and principle being the same, the rule must be the same in both cases.   If the *whole bill* is

left unanswered, it may be taken for true: and if a *part* only be left unanswered, that *part* must, in like manner, be taken for true.

These acts of Assembly of ours, allowing a bill to be taken *pro confesso* on the defendants default in not answering all of them, authorise the Chancellor in such case to pass a final decree at once, if he deems it unnecessary to issue a commis-sion. The decree by default, in all such cases, is as completely final and absolute, as a judgment by default in an action of debt at common law. The course of the English court of Chancery is, in some respects, different. There, when the plaintiff obtains a decree by default, a provisional clause is superadded, that such decree is to be binding on the defendant, unless being served with process, he shall, within a limited time, shew cause to the contrary. And this decree, being *sub modo* only, is emphatically a decree *nisi;* which cannot be, nor ever is considered as final, until the party has been served with process, and it has been made absolute by the court itself, 1 *Harr. Pr. Ch.* 625. *Redes, Tr.* 195.

This, it seems, has long been the established practice of the courts of Chancery of *Virginia;* so, that where a defendant has not answered the bill, it is held to be error to enter a final decree against him, taking the bill *pro confesso,* without the previous service of a decree *nisi*: 3 *Mun.* 83. 2 *Hen. & Mun.* 19. And it has also been held in that State, that, were some of the allegations of the bill were not answered, the plaintiff might either except to the answer as insufficient, or move to have the unanswered part of the bill taken *pro confesso.* But, if he does neither, it must·be proved, that he shall not, on the trial, avail himself of any implied admission by the defendant: for, where the defendant does not answer at all, the plaintiff cannot take his bill for confessed, without an order of court to that effect, and having it served on the defendant; and this is the only evidence of his admission: of course, if this mode of proceeding as to the confession of the whole bill be correct, it must be equally correct, as to the confession of any part; 2 *Hen.* and *Mun.* 17, 19. 2 *Mun. R.* 298-86. 4 *Rand. R.* 454. 6 *Cran.* 51.

Such is the rule, of the Chancery courts of *Virginia.* The default, in not making any answer at all; and that of not answering all the allegations of the bill, are precisely alike in kind, differing only in degree: hence, the courts of that State, have applied the same rule, in spirit and principle, to both defaults. The party is allowed to pursue the same course to have his bill, either *wholly* or *partially* taken *pro confesso,* according to the extent of the defendant's default. In this State no decree, *nisi,* is ever entered and served on a defendant who has not answered: but an absolute decree may be entered at once, as soon as he can be fixed with the default; which can be at any time after the limited period for answering has elapsed, or when he has elected to make, and has actually filed his answer to the bill. The principle and reason of the rule, in *Virginia* and in *Maryland,* are the same in relation to a partial answer. The courts in each State, follow the spirit of the established, or legistative rule, which directs the mode of proceeding, in case the defendant puts in no answer at all.

The plaintiff is entitled to an answer to each allegation of his bill, which he may require; either because he cannot prove the facts, or to aid his proof, or to avoid expense : and if the plaintiff conceives the answer to be insufficient to the charges in the bill, he may except to it; which has been compared to a demurrer at law, for want of form. The sole object of exceptions is, to extract from the defendant a more full and perfect disclosure, for the benefit of the plaintiff. They are never meant, nor intended, nor are they calculated to benefit the defendant, or to put him upon his guard in any respect whatever. The plaintiff may, if he chooses, waive his right to except: and it is always most judicious to do so, where his proofs are ample and at hand; and the character or conduct of the defendant indicates that he is not altogether trust worthy upon oath : for in such case, he will attain his object much sooner and better, by taking the answer at once, as he can get it, and proceeding directly to collect proofs, without loss of time, than by stopping to take exceptions. This is the case where the answer is *an evasive, imper-*

*fect response;* but yet such a one as goes to the whole bill, and by which each of its allegations is denied and may be put in issue. But to what end, or for what purpose, where no explanation or discovery is sought for by an allegation, should the plaintiff by exceptions call for an answer to it; where it is impliedly, and tacitly admitted by not being answered. In such case, both parties would be delayed and troubled, and the defendant put to much expense without any object whatever.

The general replication puts in issue *only the denial or avoidance of the answer, nothing more;* and neither party is allowed, nor can be called on, to adduce proof respecting any matter not put in issue. The unanswered part of the bill therefore must be admitted, since it cannot be, according to a correct and orderly course of proceeding, proved at the hearing. But if the unanswered allegations of a bill were required to be proved, or to be rejected altogether at the hearing, then the defendant would be allowed to take advantage of his own laches: and a want of frankness and simplicity, altogether unbecoming a court of equity, would be tolerated and encouraged: and the plaintiff would be driven to except, in all such cases, merely to extract from the defendant, either a general denial, or an express, instead of a tacit disclaimer or confession; when, in truth, it might have been the intention of the defendant, as it is fair to infer it was, to concede the unanswered allegation, for the express purpose of avoiding the costs and expense of an answer, of exceptions, and of proofs, by letting a decree by default go for so much as he had left unanswered.

In ancient times, when the defendant used only to set forth his own case, in the answer, without answering every clause of the bill, it was the practice for him to add, at the end of the answer, a general travers, without that, that the matters set forth in the bill are true, &c. But, where the whole bill, and every clause in it, has been fully answered, the adding of a general traverse is rather impertinent than otherwise; and, if issue is taken, upon its general traverse, it is a denial only of every thing not answered before by the answer. *2 P. Will.* 87. But, there is no case, in which this general traverse has ever been

relied upon, as an answer. If it ever had been so considered, it must have occurred, in some of the numerous cases of exceptions to answers, to have insisted on it as such; yet nothing of the kind appears. The whole range of adjudged cases shew, that the extent and compass as well as the sufficiency of the answer, as whether it is as frank as it ought to be, or whether it covers the whole, or only a part of the bill, are to be ascertained from the body of the answer itself: and not from the formal introduction, or the formal general traverse or conclusion of it. But, in this case the usual general traverse, denying the truth of all the unanswered allegations of the bill, has not been added by the way of conclusion to any of the answers.

In the case of *Hopkins vs. Stump*, et. al. 2 *Harr. and Johns.* 301, *Chancellor Hanson* says, "it would seem likewise, that the complainant misunderstood the Chancellor in another particular. But no person, acquainted with the *laws*, or *rules*, or *practice* of this court, would conceive it the meaning of the Chancellor, that whatever matter stated in a bill is not denied, must be considered as admitted. No! If interrogatories stated in a bill are not answered, the complainant has a right to except to the answer, and if the interrogatories are proper, the defendant will be compelled to answer plainly, fully and explicitly. If then any material matter charged in the complainant's bill, has been neither denied nor admitted by the answers, it stands on the hearing of the cause *for nought*; this assuredly every lawyer will admit."

This language is strong, indicating that it came from a mind at home upon the subject before it, and that it was thoroughly and perfectly satisfied of the correctness of the positions thus advanced. But, to the latter of them, my mind cannot yield its assent; and, therefore, I have deemed it a respect due to the memory of my predecessor, to set down the authorities, and the reasons which have led me to a different conclusion. From all that has been said upon the subject, it appears to be agreed on all hands, that the plaintiff being entitled to an answer to each allegation contained in his bill, may except to an answer which omits to respond to any of them; that, in Virginia, the plaintiff, by a certain prescribed mode of proceeding, may have the un-

answered allegations taken for true, but if he omits to take that course for that purpose, and goes to hearing, he must then prove the truth of the unanswered allegations, or they will be disregarded ; that according to *Chancellor Hanson,* the unanswered allegations stand on the hearing of the cause *for nought,* and that in my opinion, all material allegations of the bill, as to which the answer is entirely silent, are on the hearing, *to be taken pro confesso.*

A *fifth* general rule is, that where an answer in the body of it, purports to be an answer to the whole bill, but the respondent declares, that he is entirely ignorant of the matters contained in the bill, and leaves the plaintiff to make out the best case he can, or any language to that effect ; and, the plaintiff files the general replication ; all the allegations of the bill are thus denied and put in issue ; and consequently, all of them, must be proved at the hearing against a defendant who has thus answered. 1 *Ves.* 274.

This in England, is said to be the usual form of the answer of the Attorney General ; and no exception can be taken to such an answer ; or, indeed, to any answer of the Attorney General, 2 *Mad. Ch.* 335. The same form and rule prevails here, where the Attorney General appears for the State. This also is commonly, the form of the answer of an infant, or a person *non compos,* who answers by his guardian or committee. And, by a long established practice, individuals, who are, in truth, ignorant of the whole matter as to which the bill requires any disclosure ; but who are made defendants as having an interest in the matter in controversy, have been permitted, by this general mode of answering, to deny the whole bill, and to put the plaintiff to prove all its allegations at the hearing. 6 *Harr. and Johns.* 291. If, however, it appears from the bill, that the defendant has any knowledge of any matter in it, he may be required to answer more fully and particularly to the extent of his knowledge or belief.

Divesting this case then, of all extraneous matter ; of all that relates to the two first administrators of the late *Anthony Hook ;* because, this plaintiff is incompetent, in the representative character in which he sues, to recover any thing, but so much of

the personal estate of his intestate as remains in specie, or has remained, and is now in the hands of any one, who can be regarded as a trustee for the use of the late *Anthony* and his representatives; of all that which relates to the next of kin of the late *Anthony Hook;* because none of them, as such can have any title, but from one of his administrators, and no such title is alleged or pretended; and also, because none of them are made parties to this suit as plaintiffs; and *Barbara Hagthorp* and *James Hook,* who have been made defendants, are neither charged as, nor make any claim or defence in right of their being two of the legal representatives of the late *Anthony Hook;* and the case, when thus cleared on the part of the plaintiff, is simply this.

By a deed bearing date on the 17th of August, 1797, the late *Anthony Hook* conveyed certain property, therein mentioned, to the late *John Hook,* on the terms specified in the deed; which property came to the hands of the late *John,* and after his death, passed into the hands of *Hagthorp* and wife, as his administrators; and is now held and detained by them, and the other defendants, who claim from, and under them. The plaintiff alleges, that this property, according to the nature and terms of the deed, was conveyed to *John,* as an indemnity; in case and upon condition, that he should pay certain debts, therein specified, which have not been paid; and, consequently, that the late *John Hook* had held, and his legal representatives, and those who claim under them, now hold this property as trustees, for the use of the late *Anthony Hook* and his legal representatives; who is now the present plaintiff: upon which the complainant prays that this property may be accounted for and delivered up, together with the profits thereof.

The whole of this controversy has grown out of the deed of the 17*th of August,* 1797, from the late *Anthony Hook* to his son, the late *John Hook.* This indenture recites, that *Anthony,* being justly indebted to *John Moale,* and thirteen other persons who are named; but the amount due to any, or all of them, is not specified: and then declares, that *John* had agreed to pay those creditors of his father, *Anthony,* their several and respec-

tive debts; in consideration of which, and also in consideration of natural love and affection for his son; and of the further consideration of five shillings, *Anthony* conveyed to *John* his leasehold right, to two pieces of land; the one a lot of ten acres, part of the tract called *David's Fancy:* and the other a lot, fronting on *Aliceana street*, in the city of *Baltimore*, together with certain negroes and personal property; all of which are particularly described. The indenture then concludes in these words: "To Have and to Hold the said ten acre lot, and the other lot on *Aliceana street*, for and during all the rest, residue, and remainder of the original terms granted for each respectively, subject to the rents and covenants reserved and contained in the above, in part, recited lease and assignment: and To Have and to Hold all and singular the household and kitchen furniture, plate, and negroes, unto him, the said *John Hook*, his executors, administrators, and assigns, forever. Provided always, and it is the true intent and meaning of these presents, and of the parties hereto, and if the said *John Hook*, his executors, administrators, or assigns, shall absolutely omit, neglect, and refuse to pay the said recited creditors of the said *Anthony Hook*, their several and respective just debts and demands against the said *Anthony Hook*, then this indenture, and every matter, clause, and thing therein contained, shall cease, determine, and be utterly null and void, to all intents and purposes whatsoever; any thing herein contained, to the contrary thereof, in any wise notwithstanding."

This proviso, or condition, is explicit and unequivocal. The estate conveyed to *John Hook*, was to be null and void, on his failing to pay and satisfy the enumerated creditors of *Anthony Hook*. It is, in fact, a conveyance, by *Anthony*, of certain property to *John:* upon condition that he should advance a certain sum of money for the use of *Anthony*. This proviso, with the recital, gives to the whole the shape and character of a pledge or mortgage, from *Anthony* to *John*. It was intended to indemnify *John*, for money advanced by him to the use of his father: and all *John* can claim, by virtue of this deed, is indemnity and reimbursement for any money so by him advanced. In

the ordinary cases of a mortgage, the grantor is the actual debtor of the grantee: and it is stipulated that the estate conveyed, shall be absolute, if the grantor fails to pay at the appointed time. In this case, the grantee undertakes to substitute himself in the place of the creditors of the grantor, or to satisfy those claims: and if he fails to do so, then it is stipulated that the estate conveyed, shall be void. The object of the grantor, in both cases, is the payment of his debts; and, in both, security is the object of the grantee. That security, in equity, extends no further than complete reimbursement. The payment of the whole principal and interest due, and no more. 9 *Wheat.* 495. There is no clause in this indenture authorising *John Hook* to sell the property, and to apply the proceeds of the payment of the claims of the enumerated creditors: and even if there were, it would not have destroyed the redeemable quality of this mortgage, or the resulting use arising out of the nature of this deed. 3 *Harr. & Johns.* 106. In this case it is alleged, that the late *John Hook*, and his representatives, have altogether failed to pay the enumerated debts, in compliance with the stipulations of the deed. If so, *Anthony Hook* had, and his representative now has, a right to a return of this property, with its profits: or, at least, to redeem it on the payment of so much as has been advanced by *John Hook*, or his representatives.

It has been urged, that there is not the least room to deduce, from this deed, any thing like an implied or resulting use to *Anthony Hook*, and his representatives: because, it is declared to have been made, not only for a valuable consideration, as the payment of debts, and also of five shillings; but likewise for a good consideration, as the natural love and affection from the father to the son.

The doctrine of a resulting use, first introduced the notion that there must be a consideration expressed in the deed; or, otherwise, nothing could pass—but it would result to the grantor. It is certain, however, that the rule in relation to trusts, by implication, or operation of law, is by no means so large as to extend to every mere voluntary conveyance; and, consequently, if this deed stood alone, upon the valuable consideration of five

shillings, and upon the good one of natural love and affection, or upon either of them, unconnected with other circumstances, there could be no doubt of its validity, as an absolute, and effectual conveyance, from *Anthony* to *John.* 2 *Atk.* 256. But, when other matters are necessarily brought into view, or form a part of the contract, then it is no less clear, that the mere express consideration of five shillings, even with the superadded expressions, "and of other valuable considerations," or of natural love and affection, will not prevent the deduction of a trust by implication or operation of law. 1 *Ves. Jun'r.* 92. 1 *Atk.* 93, 191. 2 *Atk.* 149. And where a trust is declared as to part, or the property is to be applied for a particular purpose, and nothing is said of the residue; what remains, so undisposed of, results to the grantor. 2 *Fonb.* 116, 133.

This indenture cannot be read with a total disregard of its recital and proviso, two of its most important features. We cannot turn aside from clauses, so very striking and efficient, as the recital of the cause of its having been made, and the proviso wherein it is said, if that consideration alone be not complied with, the whole shall be a nullity. If these matters could be entirely passed over, the argument against a resulting trust would be exceedingly strong, if not altogether irresistible. But, looking to the recital, and the proviso, it is perfectly manifest, that the sole object of the deed was to secure the payment of certain creditors of *Anthony Hook.* If they were not paid, the whole deed, utterly regardless of the consideration of five shillings, and of natural love and affection, was declared to be void. The payment of the creditors was, then, that consideration alone upon which the conveyance was to stand or fall. This, is the real extent of the consideration, no more; and to this extent, and no further, the late *Anthony Hook* parted with his right and interest in this property : consequently, in the value of this property, beyond that of the aggregate amount of the specified debts, there is an implied or resulting use, remaining or vested in *Anthony Hook,* the grantor, and his representatives.

But, there is an express saving in the statute of frauds, of trusts by implication or operation of law; nor does the statute

affect trust of mere personalty. 10 *Mod.* 404. *3 Bro. C. C.* 587. Such uses, therefore, might in this case be established by parol proof, if this were not sufficiently manifest from the terms of the deed itself. 2 *John C. Rep.* 409. Let us now, then, turn to the answer and proofs.

*Hagthorp* and wife have answered jointly. She, before her marriage with *Hagthorp*, obtained letters of administration on the personal estate of her late husband, *John Hook*, and it is in that character only, that they are now brought here as defendants. They say, in relation to the enumerated creditors of the late *Anthony Hook*, "that the said *John Hook* paid the said sums of money, set out in the assignment, so far as the creditors applied for payment of the same:" and again, "that the said *John Hook* accordingly paid the debts particularly mentioned therein, (that is in the deed) as these defendants believe and charge."

It is too late now to inquire whether this answer is as frank and unexceptionable as it ought to have been or not. The only question at this stage of the proceedings, is, whether it be such a response to the bill as constitutes a sufficient defence, if uncontradicted by proof; or whether, as is often said on motions to dissolve injunctions, the answer has sworn away the equity of the bill?

The first of these sentences cannot be considered as a distinct answer to any extent; either, that the debts have, or have not been paid: and the second of them amounts to no more than a declaration of a belief that they have been paid. Where the nature of the transaction, charged in the bill, is such a one as must have been altogether within the knowledge of the intestate, the administrator may answer as he is informed and verily believes; but, the answer of an administrator must always be taken, as well with a reference to the reasons given for his belief, as to the nature of the subject of which he speaks. This, however, is a broad assertion of a belief, without giving any reasons for it; or its appearing, or being alleged, that the matter was exclusively within the knowledge of their intestate. In these particulars this answer is not so responsive to the bill as to constitute an available defence.

But, according to the bill and the deed, which is made a part of the bill, *John Hook* undertook to pay certain debts due from *Anthony Hook.* The answer to this charge must, then, from the nature of things, be such a one as would furnish evidence available to *Anthony* or his representative: it is that, the bill seeks. For, by the deed, *Anthony* was to be protected from the claims of his creditors; and upon *John's* affording that protection his title rested. In effect the bill asks, not only whether the debts have been paid, or not; but more, it requires the evidences of their payment to be produced, as a means whereby *Anthony,* and his representatives, may be protected against those claims; and such evidence, in addition to any thing that might be said in the answer, is also necessary; because it constitutes an affirmative part of that title set up by *John Hook's* representatives, in opposition to the plaintiff's claim; and must therefore be supported by indifferent testimony. All the claims of the enumerated creditors which have not been paid, it is most likely have been long since barred by the statute of limitations; but *that* is a protection which the law itself gave to *Anthony.* He is entitled, by the terms of his deed, to be furnished by *John* with the *evidence* of their being satisfied, as the means of his protection in *that form.* This answer, therefore, is not for these reasons also, so responsive to the bill as to afford the defendants an adequate defence. On adverting to the proofs and exhibits, it appears that *John Moale's* is the only one of the specified claims that has been satisfied; and none others are to be allowed as paid.

I lay out of this case the testimony of *Henry Burman,* who, as the husband of one of the distributees of *Anthony Hook,* has an interest in establishing the facts to which he testifies, and is, therefore, incompetent. All the other witnesses are competent. From the copy of the unexecuted bond, the declarations of *Bishop Carroll,* and the other occurrences and proceedings in the *Orphans' Court* found amoung the proofs, it appears to have been perfectly well understood between *Anthony* and *John,* during their lives, that *John* held, as the trustee of *Anthony,* according to the terms of the deed: and it appears, that the repre-

sentatives of *John* always admitted, that they held under the deed; and yet, except the claim of *John Moale's*, it does not appear, that they ever undertook to shew, that any of the claims of the enumerated creditors had been satisfied. It lay upon *John* and his representatives to shew, that those claims were paid; and they have not done so, and the truth is therefore that, except *Moale's* claim, none of them have been satisfied.

The answer of *Hagthorp* and wife, after some preliminary notices of several allegations in the bill, and those responses, as to the payment of the enumerated debts, passes on to a long history of the sayings, actings, and doings of sundry of the next of kin of the late *Anthony Hook*, in relation to the ten acre lot; as to all of which, for the reasons already assigned, it will be unnecessary to say any thing further. The bill specially charges, that *Hagthorp* and wife, by a deed dated on the *23d day of December*, 1819, leased, or assigned, a part of the lot on *Aliceana street*, to *Matthew Bennett*. Of these special allegations, these defendants take no notice; but say, that the late *Anthony Hook*, by an indenture dated on the *8th day of May*, 1797, conveyed the lot on *Aliceana street*, to the late *John Hook*. This is an allegation in avoidance of the bill, and certainly required to be supported by proof. But their is not even an exhibit, nor one tittle of proof in relation to it. This part of the answer, therefore, passes for nothing.

As to all the allegations of the bill, in relation to the negroes, and other moveable property mentioned in the deed, this answer is absolutely and totally silent—it says nothing: and, consequently, as to so much the bill must, according to the rules that have been laid down, be taken *pro confesso*.

Upon the whole, then, and from what has been said, it follows that the defendant, *Hagthorp* and wife, as the legal representatives of the late trustee, *John Hook*, *will* be decreed to deliver up to the plaintiff, all the property mentioned in the deed; or to pay the value of so much as they may have converted, or fail to deliver, together with the profits thereof, or the interest on the value; except certain allowances, and those parts wherewith the other defendants may be charged, as I shall now proceed to enquire and determine.

All the other defendants deduce their title, either directly or indirectly, from *Hagthorp* and wife, except *Nathaniel Chittenden,* who traces his claim from the late *John Hook.* But all allege, that they are purchasers for a valuable consideration, without notice. There is no principle of equity better settled, than that such a purchaser will not be disturbed by this court. On the other hand, it is equally well settled, that he who purchases with a knowledge of the trust, becomes himself the trustee, and stands in the place of the vendor, under whom he thus claims, subject to all his liabilities. Yet a person having himself notice, who purchases of one who had not notice, may protect himself by the want of notice in his vendor; nor shall a purchaser without notice, or a previous purchaser with notice, be affected by the notice of his vendor: and where a purchaser cannot make title, but by a deed, which leads him to a knowledge of the fact; and more especially where the deed, by virtue of which he takes, recites, or directly refers to that instrument in which the trust is declared, or from which it arises, he shall be deemed cognizant of the fact, and a purchaser with notice. These are the well established principles of equity upon this subject. 2 *Fonb.* 147, 151.

*William McMechen,* in his answer, avers that he is a purchaser, for a valuable consideration, without notice; and yet makes an exhibit, by his answer, as a part thereof, of a deed dated on the 9*th of September,* 1803: under which he takes from *Hagthorp and wife,* in which the indenture from *Anthony Hook to John Hook,* out of which the trusts arise, is clearly and distinctly referred to as one of the links in the chain of the title of *Hagthorp* and wife. This, of itself, is enough to shew that *McMechen* is a purchaser with notice. But the proofs leave no doubt upon the subject: they shew, that he had ample notice.

This defendant, therefore, *will* be decreed to deliver up and reconvey to the plaintiff whatever of the ten acre lot, thus acquired by him, he may now hold: and to account for the rents and profits thereof, from the date of the deed under which he obtained possession, with such just allowances as he may be entitled to; the nature of which shall be specified.

*Samuel Moore* and *George A. Hughes* answer jointly; they positively aver, that they are purchasers of *William McMechen,* for a valuable consideration, without notice. But they exhibit no evidence of title, nor any proof of right whatever. Accord-ing to the rules and principles before laid down, they cannot be permitted thus to swear themselves into the estate of the plain-tiff; and consequently, even if their answer were in other re-spects fully responsive to the bill it could not avail them as a defence, unsupported, as it is, by proof. These defendants *will,* in like manner, be decreed to deliver up and reconvey to the plaintiff the proper y held by them; and be also charged with rents and profits, from the 1*st day of May,* 1818, when it ap-pears they obtained possession.

*John Cator,* by his answer, states, that he purchased of *Mc-Mechen* that which he holds. His predicament and pretensions are similar, in all respects, to those of *Moore* and *Hughes.—Cator,* therefore, *will* likewise be decreed to deliver up and re-convey, and also to account for the rents and profits of what he holds, from the 1*st of May,* 1818; when he was let into posses-sion, with such just allowances as shall be specified.

*John S. King,* by his answer, states, that he leased from the defendant, *Cator;* but having exhibited no better title than his lessor, *will* be in a like manner, ordered to deliver up, reconvey, and account for the rents and profits, to the plaintiff, from the 9*th of March,* 1819, when he took possession.

*John Weaver,* in his answer, says that he, too, is one of those who purchased of *William McMechen.* This defendant has also left his answer entirely destitute, and wholly unsupported by any exhibits or proofs. He *will,* therefore, be decreed to deliver up, reconvey, and account for, the rents and profits to the plaintiff. He admits that he obtained possession in the year 1819; but does not specify the day or month. A medium, in the absence of proof, *will,* therefore, be taken; and the ac-count *will* commence on the 1st day of July, of the year 1819, with such just allowances as shall be specified.

The defendant, *John Fitzgerald,* in his answer, states that on the 4th of September, 1806, he purchased of *John H. Hall,* a

part of a parcel of ground, containing ten acres; part of a tract of land called *David's Fancy:* that he gave for it a valuable consideration; and had no notice of the claim of the representatives of the late *Anthony Hook.* He then goes on to state, that he purchased of the defendant, *Hagthorp,* two other parcels of the same ten acre lot; the one on the 9th of August, 1810, and the other on the 17th of June, 1815; and that he purchased a fourth parcel of it, on the 17th of September, 1811, of *Gerard Tipton;* for all of which, he avers, he paid a valuable consideration, and that he had no notice of the claim of *Anthony Hook's* representatives. This answer is also entirely unsupported by any evidence whatever; and, therefore, this defendant *will* be decreed to deliver up, and reconvey to the plaintiff so much of the ten acre lot, mentioned in the bill, as he holds: and *will,* also be held accountable for the rents and profits thereof, from the dates when he obtained possession of each parcel respectively. The nature of the just allowance to which he may be entitled, *will* be described.

*Benjamin Rawlings,* surviving executor of the late *William Rawlings,* states, that his co-executrix, *Catharine Rawlings,* who had been made a defendant, is dead: that he is in possession of part of the ten acre lot in the bill mentioned, by virtue of a deed bearing date on the 10th day of September, 1804. This answer is also entirely unsupported by proof. This defendant *will* be decreed to deliver up and reconvey the property, so held by him to the plaintiff; and be charged with the rents and profits, as executor, from the date of the deed under which his testator obtained possession; with such just allowances as shall be specified.

The defendant, *Matthew Bennett,* in his answer, says, that he is in possession of a part of the ten acre lot mentioned in the bill, which he holds under a conveyance from *Hagthorp and wife,* dated on the 3d day of August, 1810. But this defendant, too, has left his answer entirely destitute of proof. The bill expressly alleges, that *Hagthorp* and wife, by deed, dated on the twenty-third day of December, 1819, leased a part of the lot on *Aliceana street* to *Matthew Bennett:* in relation to which, this

defendant says nothing in his answer. This allegation of the bill, as against him, must therefore be taken for true. He *will* be decreed to deliver up, and reconvey all the property held by him, to the plaintiff: and to account for the rents and profits of each parcel from the time he took possession.

The defendant, *Nathaniel Chittenden*, admits that he holds possession of the lot on *Aliceana street* to which he derives title, through various mesne conveyances, from the late *John Hook*. He avers that he, and those under whom he claims, were, all of them, purchases for a valuable consideration, without notice ; but produces no proof in support of the allegations of his answer. He *will* therefore, in like manner, be decreed to deliver up and reconvey the property, so held by him, to the plaintiff; and be held accountable also for the rents and profits.

The defendant, *James Hook*, on the 7th day of February, 1823, filled his answer; and he says therein, to the *amended bill* of the complainant; but there does not appear to have been any amended bill put upon the record until some time after that day. There is, however, no charge whatever made against this defendant, and therefore the bill *will* be dismissed, as to him, with costs.

I have said, that the *recital* and *proviso* in the indenture of the 17th of August, 1797, from *Anthony Hook* to *John Hook*, gave to that instrument the features and character of a mortgage. Consequently, the original parties stood and their legal representatives now stand in the relation to each other of mortgagor and mortgagee, or trustees, and *cestui que* trusts. No acts, or circumstances appear to have occurred to destroy the redeemable quality of that deed. *Hagthorp* and wife, as administrators of the late *John Hook*, have succeeded to his character of trustee, and the defendants who all claim under them, except *Nathaniel Chittenden*, who derives his claim from the late *John Hook*, as purchasers with notice for so much as they hold, stand charged with the same trusts.

The whole of the property mentioned in the bill has been continually in the possession of the late *John Hook*, anb those who have succeeded to, and claim under him, ever since the

year 1797. They have protected it, relieved it from burthens and charges, and have placed upon some parts of it lasting improvements. It now, therefore, only remains to apply the rules of equity in relation to these matters, and to direct how the accounts shall be stated.

If a mortgagee, without the assent of the mortgagor, assigns the mortgaged estate to an insolvent person who he puts into possession, he will be held answerable for the rents and profits received both before and after the assignment; upon the principle, of its being a wilful breach of trust, to transfer the property to another, which, as trustee, he had no right thus to dispose of, to the prejudice of the mortgagor. *Pow. Mort.* 948. *2 Fonb.* 179. A trustee is, in no case, to be charged with imaginary values, but only with what he actually receives: and the same rule applies to a mortgagee, in possession, who is regarded as a trustee. But no default must be imputed to him; for in all such cases, he will be charged with what he might have made, but for his default. The annual value is that which the premises are actually worth nett, according to a fair estimate, clear of all necessary charges.

Under the head of just allowances, it has long been the course of the court to allow a trustee, or mortgagee in possession, for all necessary expenses incurred for the defence, relief, protection and repairs of the estate: such as costs of suit, and fees for taking opinions and procuring directions necessary for the due execution of the trusts, 10 *Ves.* 184, taxes, paving contributions, ground rent, and sums expended in necessary repairs. *Pow. Mort.* 956, *n.* 2 *P. Will.* 455. It has been also said and I think with justice, that where a mortgagee, thinking himself absolutely entitled, had expended considerable sums in repairs and lasting improvements, he should be allowed the value of them. *Pow. Mort.* 956, *n.* And in a modern case, the value of new buildings, erected by the mortgagee, was allowed, 4 *Ves.* 482, and a liberal allowance for the improved value of slaves while in the possession of the mortgagee, was directed to be made. *Ross vs. Worrall,* 1 *Wash.* 14. The grounds of these decisions appear to be, that a mortgagee in possession, is the legal holder

of the estate; which the mortgagor may at any time redeem and so prevent him from making any repairs or improvements, and if the mortgagee has been long in the possession, claiming adversely, and suffered to treat the estate at his own, and the mortgagor stands by and permits lasting improvements to be made, he shall pay for them. *5 Harr. & Johns.* 147. *4 John. C. Rep.* 122.

But the estimate of the value of such lasting improvements is to be taken as they are at the time of accounting or passing the final decree. For such allowances are made upon the ground, that the improvements do, in fact, pass into the hands of the plaintiff as a new acquisition. And they can only be a new acquisition to him, to the extent of their value at the time he recovers or obtains possession of them; and therefore their value at that time is to be allowed, and nothing more. *3 Rob. Adm. Rep.* 101. It is also necessary to observe that in charging rents and profits, the estimate must not include any profits which arise exclusively from such improvements; for, if they were to be embraced by the estimate, the occupier would, in fact, be paying for the profits of that which was his own; and the plaintiff would be allowed to derive the benefit from a new acquisition before the court had awarded it to him. Therefore, the estimate of rents and profits must be made, in exclusion of such as appears to have arisen from the occupying claimant's own expenditure in improvements. *1 John. C. Rep.* 388.

In this case, the late *John Hook* disposed of the lot on *Aliceana street*, and his representatives *Hagthorp* and wife, having disposed of the other property in a manner in which they had no right to do, and the bill standing unanswered, and for true, as to the negroes and moveable property, *Hagthorp* and wife must be charged with the value of the whole of that property, and interest thereon, from the date of the deed from the late *Anthony Hook* to the late *John Hook*, and the account for the rents and profits of the chattels real, will commence from the same date. *Hagthorp* and wife must be charged with the rents and profits of all the chattels real, mentioned in the bill up to the time when they, or any part of either passed into the hands of any

of the present defendants. But *Hagthorp* and wife will be held liable for the whole amount charged against the other defendants, or to the amount which all, or any of them may fail or be unable to pay to the plaintiff, and these defendants must be credited with the amount of the debt which was due from *Anthony Hook* to *John Moale* at the time of the execution of the deed to *John Hook*, with interest thereon, from the time when it appears to have been paid.

The account against each of the other defendants will commence from the day on which it appears by his answer, or by the proofs now in the cause, or which may hereafter be exhibited, that he obtained possession, and he will be charged for all the time he held that portion of the property, or until it passed into the hands of another of the defendants. The account against each of the defendants who is now a holder of any portion of the property is, for so much as he holds, to be brought down to the time of taking the account.

Whereupon, it is ordered, on this 5th day of December, in the year 1826, that this cause be, and the same is hereby referred to the Auditor, with direction to state an account, or accounts, accordingly; from the proceedings and proofs now in the cause, or such other proofs as may be laid before him by the parties: and it is further ordered, that the parties be, and they are hereby allowed to take such testimony as they may think proper, in relation to the accounts so directed to be stated by the Auditor; on giving to the opposite party or his or their solicitor three days notice as is usual. Provided, that no testimony shall be used before the Auditor, or, in any way admitted into this cause, unless it be taken and filed with the Register, on, or before the 15th day of January next. From this order the defendants appealed to this court.

The cause came on to be argued before EARLE, ARCHER and DORSEY, J. when,

*Williams*, (District attorney of *U. S.*) and *Learned* for the appellee, moved the court to dismiss the appeal, upon the ground that an appeal did not lie from the order of the Chan-

cellor in this case, as it did not settle any question of right between the parties.    They referred to *Snowden vs. Dorsey*, 6 *Harr. & Johns.* 114.   *Thompson vs. M'Kim, ib.* 327, and *Oehler vs. Walker*, 2 *Harr. & Gill*, 326, 329.

*Moale* and *R. N. Martin* against the motion, referred also to *Snowden vs. Dorsey*, and *Thompson vs. M'Kim*, and to *Strike vs. M'Donald*, 2 *Harr. & Gill*, 191.

DORSEY, J. delivered the opinion of the court.

A motion being made to dismiss the appeal to this court, on the ground, that the Chancellor decided nothing in controversy between the parties which can properly form the basis of an appeal; to present a view of the question, but few of the facts contained in the record need be stated.   The appellee sought to recover certain leasehold and personal property, with the rents and profits arising therefrom.   The right to such recovery being resisted by the defendants, and much testimony in relation thereto, being taken under commissions issued for that purpose; after the case had been argued, the Chancellor, in his explanatory or introductory remarks to what he was then about to order, discusses at great length many rules and principles of equity and a great variety of facts, all of which he considers clearly in favour of the appellee, and announces his intention at some future time to decree accordingly: and to enable him to do so, he passed the following order, viz: (See the order ante, p. 307.)

From this proceeding of the Chancellor, the present appeal has been prosecuted; and the only question submitted to our consideration is, does this order so settle or materially affect all or any of the rights or interests in controversy between the parties, as to make it a decretal order from which an appeal would lie agreeably to the provisions of the acts of Assembly of 1785, *ch.* 72, and 1818, *ch.* 193?   We are clearly of opinion that it does not.   To ascertain what has been decided by the Chancellor, we must look to the order itself.   If its expressions be explicit, unequivocal, we need search no further for its import; but must give it that interpretation which it bears upon its

face. If its construction be ambiguous; then, as the best key to its exposition, we must refer to the introductory remarks of the Chancellor upon which it was founded. In the present order there is no doubt, no ambiguity; and its operation cannot be enlarged by the prefatory observations with which it is connected. Indeed, they are in perfect accordance with its literal, obvious meaning; and demonstrate, that all which the Chancellor designed to adjudicate, was, that the auditor should state certain accounts indispensable to the determination of the questions in litigation. Such an order is a mere preparative to the decisions of the cause; and not *decretal.* 'Tis true the Chancellor, in considering this case, has discussed all the matters both of law and fact, which he deemed in any wise involved in the decree, eventually to be pronounced; and has distinctly declared what he *intends* to decree. But his *intentions* form no ground for an appeal: he may abandon or change them *ad libitum;* until carried into effect, no injury can result from them. It is only, from what he has *done,* and not from what he *intends to do,* that an appeal will lie. All that he has done is to direct an audit: every disputed right and interest of the parties remains undetermined; and is, by the express declaration of the Chancellor, to be settled by his future decree. Until such decree be passed, upon application a commission to take further testimony might issue, an unquestionable title to the relief prayed for might be made out. If we now sustain the jurisdiction we are called on to exercise, and, in accordance with the appellants views, dismiss the appellees bill of complaint: we deprive him of all such opportunity of strengthening his claims for relief; we in fact become a court of original not of appellate judicature. We usurp the authority of the Chancellor, and reverse decrees which he never did make, and perhaps never would have made. Such a proceeding is utterly inconsistent with the character and attributes of a Court of Appeals.

But reasoning upon this subject is unnecessary : the question is put to rest by the authority of *Snowden et al vs. Dorsey et al.* 6 *Harr. & Johns.* 114: a case not distinguishable from that now before us. There the Chancellor upon a bill filed for the con-

veyance of land, ordered an account to be taken of the rents and profits; and in the statement of his views introductive of that order pronounced his opinion (as here) that the complainants claim to relief had been established. Yet, upon an appeal from such order, after argument, and a thorough examination of the practice and decisions upon the subject, this court dismissed the appeal, as being prematurely taken to an order, not decretal.

It was urged in the argument of the appellants counsel, that the right of appeal in this case was fully established by the doctrine settled in *Thompson vs. M'Kim,* 6 *Harr. & Johns.* 302. But the cases are in no wise analogous. There, as is justly observed by the Chancellor, to warrant the issuing of the order, the facts must be "either admitted or so established as to be open to no further controversy at any subsequent stage of the proceedings; and the party making the motion for such order must shew that he has an interest in the money called in; and that he who holds it in his possession, has no equitable right or title to it whatever." Here to justify the order for an audit, no such conclusive establishment of facts is indispensably necessary. There material and irreparable injury was done by the order, let the subsequent decree of the Chancellor be what it might, or although no future decree be ever made. Here no material injury is inflicted on the appellants unless followed by a decree; and that decree too against them. Here the order is not decretal or final as to the rights or interests of the appellants. There the order is not only decretal, but in effect final upon the rights and interests of the appellants, and needed not the aid of any future decree or order upon the subject. *Ex natura rei,* the granting the order to bring the money into court, adjudicated on every right and interest which the appellant claimed. *In no* future order or decree was it necessary to name or even refer to him; as to all subsequent proceedings, he was no longer a necessary party in court. All that remained to be done in the cause was, an order for the distribution, among the creditors of *Heyland* of the money brought into court.

Strong efforts were made in the argument to distinguish this case from that of *Snowden et al. vs. Dorsey et al.* founded upon an expression in the courts opinion, in *Thompson vs. M'Kim,* stating that the order passed in *Snowden et al. vs. Dorsey et al.* "bore no impress of the Chancellor's judicial opinion upon the merits of the case." The order, it was contended, in the case at bar, did bear such an impress. But the weight of the argument rests upon a misconception of this expression of the court. They did not mean to say, that the introductory remarks to the order in *Snowden et al. vs. Dorsey et al.* bore no impress of the Chancellor's opinion upon the merits of the case; because the reverse is most palpably the fact: it does bear the impress of his opinion : but not of his "judicial opinion." The impress of the Chancellor's "judicial opinion," in the sense in which the court have used it, being synonymous with, what he has adjudged or decreed.

APPEAL DISMISSED, BUT WITHOUT COSTS.