JOSEPH H. JONES, ADM'R D. B. N., OF JAMES HAWKINS, AND ADM'R OF SUSANNA CLAGETT, *vs.* JOHN C. JONES.— *June* 1846.

*S,* the creditor of *C,* obtained a decree for the sale of real and personal estate, mortgaged by the latter to him; and at the sale thereof became the purchaser. After the sale, *C* agreed to repurchase the property, and applied to *H* to advance him certain bank stock and bonds, on account of which *S* conveyed to *H* four hundred acres of the estate in question, agreeing to receive the stock and bonds as cash; and that the balance of the mortgaged estate should remain subject to a lien, to *H,* for the sum due him beyond $10,000, the value of four hundred acres of land conveyed to *H.* The debt due from *C* to *S,* was ascertained to be less than *S* originally claimed. Some years afterwards, *S* sold and conveyed his interest in the estate to *J,* for the sum of $7265.65. By the indenture between *S* and *J,* it was covenanted, that *J,* by his indenture of mortgage upon the said estate, would secure to *S* the payment of one of the aforesaid bonds; and also secure him from the claim of *H* thereon, and which claim was not to be altered or prejudiced by the sale from *S* to *J;* and that *J* was to stand in the place of *S.* Upon a bill filed by the representatives of *H* to enforce his lien, it was decreed, that unless *J* should pay the balance due to *H,* on or before, &c., then the estate should be sold, and out of the proceeds thereof, after payment of the debt of *S* assigned to *J,* the complainant should be paid. The decree also directed an account of rents and profits, &c., to be taken, and after allowing *J* for all just and necessary improvements made by him upon the the said estate after he came into possession, the balance should be applied to the payment of *J's* claim, as assignee of *S.*

The interest conveyed by *S* to *J,* in equitable contemplation, was but a lien upon the premises for the balance due by *C* to *S.*

An exhibit which consisted of mere pencil marks upon an isolated paper, unexplained by any testimony to show the time or occasion which gave birth to it, as testimony is of too questionable a character to be made the basis on which the rights of the parties litigant in the cause, should be adjusted.

Where the testimony of several witnesses in regard to the amount of rent which ought to be paid, was of such a nature as to require it to be averaged, the aggregate amount ought to be ascertained by adding together the estimate of each and every witness who testified thereto, and dividing the sum thus obtained by the *entire* number of witnesses. Concurring witnesses will each be counted as one.

The rule of averaging the testimony of witnesses, necessarily excludes, and is apart from all corrupt concert between the witnesses.

When a defendant purchased in ignorance of any defect of title, though apprized of the claim of the complainant for a lien on the premises purchased, and took possession and made improvements under the opinion of counsel that the title was clear; and all his acts and the circumstances of

the case demonstrate, that at the time of his purchase, and when the improvements were made, he believed his title to be a good one, he is entitled to compensation, as a *bona fide* possessor, for the amount of his melioration and improvements of the estate, beneficial to the true owner.

Where a complainant has no absolute unqualified right to the interposition of a court of chancery—is only entitled to relief in the sound discretion of the court, which may be modified, made conditional, or wholly denied, as may be consistent with the dictates of equity and conscience, as when he seeks to enforce the specific execution of a contract—the defendant in possession will be allowed for such improvements, made *bona fide*, without a knowledge of the defect of his title, as have permanently enhanced the value of the lands, and to the extent of such enhanced value, the plaintiff is bound in conscience to make compensation, *ex æquo et bono*.

In ascertaining the value of lasting improvements, whether they are to be estimated at their *original* cost, or at their *actual* value, at the time of the audit made—if the property only is recovered, then the estimate is to be made at the time of the audit; but if rents and profits are charged agreeably to the improved value, then, at the original cost; or if independently of improvements, at the value at the time of the audit.

Where the enhanced annual value of an estate was, in a great measure, the result of expenditures made in the melioration of the soil, substantial justice is done by considering the enhancement of the rents as a fair offset to the expenditure for melioration.

Improvements will be estimated at the time of the audit, in the absence of proof of their original cost, the time when they were made, and their depreciation since, if any.

Ditching and grubbing meadow land, may be necessary, lasting, and valuable improvements; and if so, upon the proof must be allowed for accordingly.

APPEAL from the Court of Chancery.

The bill was filed on the 7th February 1835, by the appellant against the appellees, and amended on the 14th June 1838. The amended bill alleged, that *C. C. Jones* being largely indebted to *Clement Smith and others*, the said *C. S.* filed a bill against him, praying for the sale of certain mortgaged premises; that a decree was obtained, and on the 7th April 1823, the lands and personal property of *C. C. J.* were sold under such decree, and purchased by *Clement Smith* for the sum of $23,976. That after such sale, it was proposed on behalf of *Smith*, that if the said *C. C. J.* would pay the said *Smith* $22,000, that the said *Smith*, to avoid all further litigation, would relinquish all claim to the property sold under the decree, and then in *C. C. J's* possession; but *Jones*, pro-

testing that he did not owe *Smith* so large a sum, and being unable to procure the same, applied to *James Hawkins* to advance him $10,000 in bank stock; and also certain bonds of *W. D. Digges*, for $2500, with interest; and of *De Butts* to amount of $3000; and promised to convey to *James Hawkins* in fee, in consideration of the advance of $10,000, four hundred acres of the land, mortgaged and sold as aforesaid, to the said *Smith*, and to secure the amount due on the bonds aforesaid, by a lien on the remainder of the said land and personal estate aforesaid; and the said *James Hawkins* undertook and agreed to advance the money and bonds aforesaid, as aforesaid, if the said *Clement Smith* would agree to the same.    Whereupon the said *Clement Smith* and *Charles C. Jones*, on the 15th January 1825, entered into the following agreement of writing, to wit:—

"Terms of compromise between *Charles C. Jones* and *Clement Smith.    Basis.*—The bargain with *Hawkins* to be carried into effect by a conveyance from *Mr. Smith, &c.*, upon turning over to *Mr. Smith* the proceeds for which he shall credit *Mr. Jones*, in account, at the market value of the stock; the other securities in the hands of *Jones* which *Smith* agreed to receive as cash, (as *Digges'* and *De Butts'* bond, now deposited with *Mr. Davidson*,) to be assigned over and delivered to *Smith;* and all the property, real and personal, of *Jones*, which was purchased by *Mr. Smith* at the trustee's sale under the decree, to remain under lien for the balance, after deducting the sum total of the several items to *Mr. Jones'* credit, as aforesaid, from $22,000, on such times and under such limitations, as *Mr. Lufborough*, and *Mr. Davidson*, and the counsel for the parties, may fix, so as *Jones* remained in possession, and have not less than a year to release the lien: the mode of releasing that lien, and the time in other respects, to be settled by the said reference.    The personal property placed on the farm by *Mr. Smith* since his purchase, and there remaining, to be returned to him; such allowance for grain in the ground, crops, &c., as the referees may determine. The whole matter of detail to fill up this outline, so as to place the parties in a state of security and mutual accommodation,

12    v. 4.

to be filled up and provided for by the referees.—And as *Mr. Jones* disputes that his debt to *Mr. Smith* amounts to $22,000, it is also agreed, that *Mr. Lufborough* and *Mr. Davidson* shall settle the account, so as to ascertain whether any, and what deduction, ought to be made from the $22,000; and such deduction shall be credited against the balance charged upon the said property, accordingly. The securities above mentioned to be assigned as cash, are nevertheless, to be secured by the same lien as the balance above mentioned, and adequate provision by formal writings to be made for the whole, when the details are adjusted.''

The bill further charged, that the referees delivered their award to the said *Smith*, ascertaining and fixing the amount of the debt due from said *Charles C. Jones* to said *Smith*, at $22,000, and requiring the liens to be executed as aforesaid; that *Smith* and *Jones* always acknowledged to said referees the right of said *Hawkins*, to be secured in his advances, to the amount of said bonds, by a lien as aforesaid, and the said *Smith* received the said bonds with that agreement and understanding. Nevertheless the said lien has never become executed by the said *Smith* to the said *Hawkins*, in his lifetime, or to his representatives, since his death; that *C. C. J.* failed to pay *Hawkins* during his life, who devised his estate to, &c.; that *C. C. J.*, at his death, was indebted to *Smith* for a large balance, parcel of the award; and that *Smith*, on the 13th June 1837, sold and conveyed to *John C. Jones* all the estate of *Charles C. Jones*, mortgaged to, and purchased by, the said *Smith*, not previously conveyed to the said *Hawkins*; that *John C. Jones* had full notice, before making his purchase, of the claim of complainant to a lien on the said premises; and that the said *Jones*, in order to secure to the said *Smith* the payment of the bonds of the said *W. D. D.* and *De B.*, has mortgaged the estate purchased by him, as aforesaid; that *C. C. J.*, from 1823, to his death, was insolvent, and often declared that the property he held, the *Clean Drinking* estate, and the personal property thereon, belonged to said *Smith* and *Hawkins*, and that he, *Jones*, was merely agent for them, and that *Smith* took possession thereof at his death, &c. Prayer,

that the amount of the bonds aforesaid, may be decreed to be a lien on the real and personal estate sold by the said *Clement Smith* to *John C. Jones*, after satisfying the balance due from the said *C. C. Jones* to the said *Clement;* that the said *Clement* may account and show what balance is still due from the said *C. C. J.* to him; and what sums he has collected on the said bonds; and that in default of the payment of the amount due from *C. C. J.* to said *James Hawkins*, the lands, &c., may be decreed to be sold; and for other and further relief.

With the original bill was filed "the admission of *C. C. Jones*, dated 5th November 1825; that the whole property mentioned in the bill, did belong to *James Hawkins* and *Clement Smith;* that it was merely under his care as agent. That as regards the hay and tobacco on the said estate, it should be under the exclusive control of *R. Ross* and *Nathan Lufborough*, for sale; that the net proceeds thereof be paid over to the said *Hawkins* and *Smith;* the amount of which they are to account for in any settlement which may hereafter be made with me, and by them, touching the fulfilment and execution of a conditional agreement, made between me and said *Smith*, in January last, (1825.) "

With the amended bill was filed a deed of the 1st July 1837, between *John C. Jones and wife*, of the one part, and *Clement Smith*, of the other, reciting, "that *C. S*, by deed, dated 13th June 1837, had conveyed to *J. C. J.*, for the sum of $7275.65, all those lands, &c., except so much thereof as had been conveyed to *James Hawkins* by *C. S.*, and the personal estate belonging thereto, consisting of, &c.; and whereas the said *C. S.* did agree with the said *J. C. J.*, to sell and convey the said real and personal property for the said sum, upon express condition, that the said *J. C. J.*, by his indenture of mortgage or deed of trust of the said land and personal estate, secure the said *C. S.* the payment in full of principal, debt and interest, commission and expenses, of a bond executed by *W. D. Digges*, now dead, to one *S. H.*, and by him assigned to one *James Hawkins*, assigned to and for the use of *C. S.*, and which said bond, principal and interest, now amounts to $5088

and whereas the representatives of the said *James Hawkins have set up a claim to a large amount of money, with the payment of which, it is or may be attempted to charge the real and personal estate* therein before described, and as it is agreed between the said *J. C. J.* and *C. S.*, that he, the said *C S.*, is to be secured against all loss upon the said bond, or by reason of the claim aforesaid, from the representatives of the said *J. H.*, which said claim is to be in no manner or respect altered, changed or prejudiced by the sale of the aforesaid real or personal estate, made by *C. S.* to *J. C. J.*; but in relation thereto, the said *J. C. J.* is to be considered and stand, as may, and did the said *C. S.*, before the said sale to *J. C. J.*; and conveying the property to indemnify *C. S.*, with authority to sell the property, if necessary, for his security."

The answer of *John C. Jones* to the original and amended bill admitted, that in the year 1820, the late *Charles C. Jones* being then largely indebted to *Clement Smith* for the security of said debt, conveyed to him, by way of mortgage, the tract called "*Clean Drinking*," and a valuable personal property; that the debt not being paid, he obtained a decree for a sale; the sale was made; *Smith* became the purchaser of all the property mortgaged; that the sale was duly confirmed; that a conveyance was made to *Smith*, who had thus a clear, absolute, and perfect title and possession; that *Smith*, for $12,000, sold 400 acres of his purchase to *James Hawkins*, now deceased, and executed to him a conveyance therefor. The defendant *J. C. J.* further admitted, that he has been informed, but has no personal knowledge on the subject, that *C. Smith*, at or about the time of the sale to *Hawkins*, before spoken of, *verbally* agreed with the said *C. C. Jones*, that if the said *Jones* would pay him the residue of the debt for which the property had been sold, as aforesaid, that he would reconvey to him the residue of said property; but this defendant has been informed, and believes, and charges, that the said *Jones* never did pay the balance of the said debt, or any part thereof; that nothing was done towards performance or part performance of said parol agreement; that said *Smith* in fact never did give a lien on the said property to *Hawkins*, or any other person.

The answer, among other matters, also admitted, that the defendant became the purchaser of a part of *Clean Drinking*, for a full, fair, and adequate consideration; that at the time he so purchased the said property, he knew that the representatives of the said *Hawkins* set up some such claim as is asserted in their bill, and that complainant's exhibit, No. 4, is a true copy of the mortgage executed by him to the said *Clement Smith;* that he had never given, nor agreed to give, the said *Hawkins* any mortgage or lien whatever on the said property. The defendant also admitted the death and insolvency of *C. C. Jones*, He denied all knowledge of the agreement between *Hawkins*, *Jones*, and *Smith*, as charged, and insists it was void, (if made,) under the statute of frauds, being merely by parol, and that he may have the benefit of the statute at final hearing. The answer also relied upon the statute of limitations; and further, that the complainant can have no relief, without fully reimbursing to the defendant the principal and interest of the money he has paid to the said *Clement Smith*, and all costs and expenses which he has incurred in consequence of his said purchase, and also for all improvements which he has made and erected upon the said property, of every description, which he alleges to be considerable, &c.

With the bill was exhibited :—

The will of *C. C. Jones, Eleanor C. Coates, adm'x,* and *J. C. Jones, devisee.*

Exhibit No. 4, deed of 1st July 1837, *John C. Jones and wife,* to *Clement Smith.—Ante page* 89.

After a great variety of proof was taken, the chancellor, (BLAND,) being of opinion that the proofs did not sustain the allegations in the bill, decreed, on the 28th July 1841, that the bill should be dismissed with costs. From that decree the complainants appealed to this court.

On the 30th June 1843, this court reversed the decree of the chancellor, with costs; and decreed, that unless the said *J. C. Jones*, on or before the 1st January 1844, pay or bring into the court of chancery, to be paid *Joseph H. Jones, a. d. b. n.* of *Joseph Hawkins*, deceased, and administrator of *Susanna Clagett*, residuary legatee of *James Hawkins*, the sums of

money mentioned in the proceedings in this cause, as having been advanced by the said *Hawkins*, or received by *Clement Smith*, upon the bonds of *Digges* and *De Butts*, assigned by the said *Hawkins* to *Charles C. Jones*, for the use of *Clement Smith*, or to said *Clement Smith;* which said sums of money with interest due thereon, shall be ascertained by the auditor of the court of chancery, on or before the 1st September next; subject, nevertheless, to all just exceptions as to the amount thereof, &c.; then the real and personal estate, in the proceedings mentioned, or so much thereof as may be necessary, be sold; and out of the proceeds thereof, after payment of the debt of the said *Clement Smith*, with all interest due thereon, to the said *John C. Jones*, assignee of the said *Clement Smith*, to be also ascertained, as aforesaid, the claim of the said complainant, *Joseph H. Jones*, also to be ascertained as aforesaid, shall be paid.

And it was further decreed, that in the event of the said *J. C. Jones* declining or omitting to pay or bring into court the sums of money due to the complainant, *Joseph H. Jones*, according to the principles and directions of this decree, that then an account of rents and profits, hires, issues, receipts, fruits and proceeds of the said real and personal estate, shall be taken, and the said *John C. Jones* shall be charged therewith; and that he shall be allowed for all just and necessary improvements, made by him upon the said estate after he came into possession thereof; and the balance thereof, if any due by the said *John C. Jones*, applied to the payment of his claim as assignee of the said *Clement Smith*. That *R. J. B.* be appointed trustee, &c.; and the cause be remanded to the court of chancery, for the purpose of executing this decree, &c.

The cause was accordingly remanded to the court of chancery, where the parties took proof in relation to the rents and profits of the estate, and the improvements, cost and character of them, as made by the appellee, *John C. Jones*, during his possession of the estate.

On the 31st July 1844, the chancellor, (BLAND,) ordered, that this case be, and the same is hereby referred to the auditor, with directions to restate the account, from the pleadings

and proofs now in the case, in pursuance of the decree of the Court of Appeals. The auditor will assume the consideration of $7275.65, specified in the indenture of the 1st July 1837, as the amount then due to the defendant, *John C. Jones*, as assignee of *Clement Smith*. That no interest is to be charged on the rents and profits, hires, issues and fruits, and proceeds of the said real and personal estate; that nothing is to be allowed for the ditching of any part of the land, or for any thing else done upon it, in any course of husbandry pursued by the occupying tenant; that the defendant, *John C. Jones*, is to be allowed for all just and necessary improvements made upon the estate after he came into possession thereof, estimating their value respectively, as of the date when they may have been so made: but no interest is to be charged on any sum so allowed and provided. That no allowance for improvements be made beyond the amount of the rents and profits; and that as so much of the interest on the bonds spoken of as part of the plaintiff's claim, as accrued during the lifetime of *Elizabeth Hawkins*, deceased, after the death of the plaintiff's intestate, constitutes no part of the plaintiff's claim, she having been the legatee thereof for life: the principal of the said bonds, with interest thereon, only during the life of the said intestate, and after the death of the said *Elizabeth Hawkins*, is to be awarded to the plaintiff. These directions are given to the auditor to the end, that an account may be stated, to enable this court to carry into effect the decree of the Court of Appeals, according to its true intent and meaning; and therefore all the exceptions of the parties, with so much of the former report of the auditor as may be at variance with this order, be, and the same are hereby overruled and rejected.

The auditor, in pursuance of this order, reported, that he had assumed the amount of the mortgage debt, as directed in the order, and credited the estate with certain stock, farming utensils, and slaves sold by the defendant. That he had deducted from the rent, a certain annual amount for rent of property, not parcel of the mortgaged premises, as testified to by one of the witnesses; that as no allowance had been made for improvements in the course of husbandry, the rent had been

reduced for the years 1841, 1842, 1843, and 1844, to the estimate of 1837: inasmuch as it appears from the testimony, that the increased estimate of rent is based on that kind of improvement; that the value of all the just and necessary improvements falls short of the rent and hires, and the difference credited to the estate.

After exceptions taken to this report, the chancellor, (BLAND,) on the 29th April 1845, ratified the accounts, which stated the amount due *J. C. Jones* to be $7939.59, with interest; and that due the complainants, $10,923.17, with interest.

From this order, both parties appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE, and MARTIN, J.

By R. J. BOWIE for the appellants, the complainants below.

By J. JOHNSON and RANDALL for the appellee, the defendant below.

DORSEY, J., delivered the opinion of this court.

The ground of complaint most strenuously relied on by the plaintiff below, against the orders from which he has appealed, is, that, in virtue of a direction from the chancellor to the auditor, the sum of $7275.65 has been assumed in account E, as the balance due, on the 30th June, in the year 1837, from the late *Charles C. Jones* to *Clement Smith*, and which was a preferred lien on the *Clean Drinking* farm, and the personal property thereon, sold many years before by the latter to the former. On the day and year aforesaid, the said property was conveyed, with all his interest therein, by the said *Clement Smith* to *John C. Jones*, one of the defendants below. By the decree of this court, heretofore passed in this cause, that interest, in equitable contemplation, was but a lien upon the premises for the balance due by *Charles C. Jones* to *Clement Smith*, at the date of the above mentioned conveyance. That in 1825, at the time of the compromise, as it is called, there was due, from the former to the latter, a balance of $12,000, has long since ceased to be a matter of controversy. What part of that balance remained due on the thirtieth of June 1837, is the question now to be

examined ; and upon the solution thereof depends the justice of the complaints of the plaintiff below, against what he appears to regard as an arbitrary assumption by the chancellor, of the sum of $7275.65, as the balance due at that time. Account A, as stated by the auditor, which shews a less sum than $7275.65, as the balance due on the 30th of June 1837, is based upon exhibit CS, which gives large credits, independently of the bonds of *Digges* and *De Butts*, that are wholly unsustained by any other proof or exhibit in the cause, and which, if rejected, would leave a much larger balance due to *Clement Smith* on the 30th of June 1837, than that assumed by the chancellor, as the basis or starting point for the auditor's statements. The chancellor, it is presumed, regarding, as does this court, exhibit CS, (which consists of mere pencil marks upon an isolated piece of paper, unexplained by any testimony, to shew the times or occasion which gave birth to it,) as testimony of too loose and questionable a character, to be made the basis on which the rights of the parties litigant in this cause should be adjusted, directed the auditor to assume, as the balance due from *C. C. Jones* to *Clement Smith*, the sum of $7275.65, at the date of the deed from *Clement Smith* to *John C. Jones*. This balance was not, as appears to be supposed, arbitrarily assumed, without regard to the testimony in the cause, and in disregard of the interests of the plaintiff below. The assumption was made for his benefit, as, after the rejection of exhibit CS, a detailed statement of debits and credits would have exhibited a much larger balance. It was made in reference to the testimony in the cause, the chancellor regarding the purchase money expressed in the deed from *Clement Smith* to *John C. Jones*, as an admission by them of the then balance due to *Smith* from *C. C. Jones*. After the rejection of exhibit CS, of which we approve, with the chancellor's assumption of such balance, the plaintiff below ought to have been satisfied. But not so the defendant. He, being entitled to the entire balance due to *Smith*, had a right to complain that the chancellor had overlooked the testimony of *John Marbury* and *Clement Cox*, which proved, as far as concerned admissions by *Clement Smith* and *John C. Jones*,

(and by such admissions only could it be reduced to the amount assumed by the chancellor,) that the balance due from *C. C. Jones* to *C. Smith*, was $7375.65, instead of $7275.65. For this reason, therefore, if all others were wanting, the appeal of the defendant, *John C. Jones*, must to that extent be sustained.

But this is not the only ground upon which it can be sustained. The testimony given by the nine witnesses, testifying as to the amount of rent with which *J. C. Jones* should be charged, as the occupant of the *Clean Drinking* estate, being of such a nature as to require to be averaged, the auditor made a statement for that purpose, in which, instead of obtaining the aggregate amount, by adding together the estimate of each and every witness who testified thereto, (without reference to their agreement or disagreements in the amounts of their estimates,) and dividing the sum thus obtained by the entire number of such witnesses, by which means, the averaged amount of rent would have been fairly and justly ascertained ; three of the witnesses having deposed, that $150 per annum would be a fair rent ; two that $300 would be ; and the remaining four witnesses having each deposed to a different amount, he added one $150 for the three concurring witnesses, and one sum of $300 for the two concurring witnesses, to the several amounts of the four dissentient witnesses, and to reach the true average result, divided the sum thus obtained by six, thereby, in effect, rejecting altogether the testimony of three of the witnesses, and making the averaged rent $316.67 ; whereas, in this case, if the aggregate sum had contained, as it should have done, the estimate of each and every witness, and been divided by nine, (the whole number of witnesses,) the annual average rent with which *John C. Jones* should have been charged, would have been but $277.78. By such a rule of averaging testimony as this, if a plaintiff has fifty witnesses, all of whose estimates agree in amount, and the defendant has one witness making a different estimate, forty-nine of the plaintiff's witnesses are virtually rejected ; and the decision of his case is identically the same that it would have been, had he sworn in his behalf but one of his witnesses. If any thing further could be necessary to shew the injustice and unreasonableness of such a rule, *its* applica-

tion to figures would, perhaps, be a clearer demonstration. Should the estimates of fifty concurring witnesses for the plaintiff be one dollar, and the estimate of a defendant's only witness should be $1000, the average value, under this rule, would be $500.50. But if the plaintiff's witnesses should all differ in their estimates, that of each succeeding witness being one cent higher than that of the next preceding, (so that the estimate of the first witness being one dollar, that of the last would be $1.49,) the average value by this rule would be a fraction less than $19.87 ; and yet, apart from all corrupt concert between the witnesses, which the rule of average necessarily excludes, could it, in reason, justice, or common sense, be for one moment supposed, that the plaintiff's interests were less strongly fortified by proof in the first hypothesis, than in the second. The order of the chancellor of the 29th of April 1845, resting on such a rule of average, and being appealed from by *John C. Jones*, must be reversed.

The plaintiff below complains, that no credit has been given him for the proceeds of sale of a great number of the negroes of *C. C. Jones*, sold since the sale of *Clement Smith* to *John C. Jones*. But from a careful examination of all the testimony properly before us, it appears that the auditor, in account E, has given every credit for the sale of negroes since the 30th of June 1837, to which the plaintiff below was entitled. And there is no foundation for the complaint, that four negroes were sold to *William J. Stone*, and credit given but for the price of one of them. *Stone* himself conclusively proves, that for *George* and *Polly*, no credit ought to be given. That he considered them of no value, but an incumbrance upon his bargain. That he offered the same price which he paid for the four, for the other two, and *John C. Jones* refused to sell him the two young negroes, unless he would take, with them, the two old negroes, *George* and *Polly*, their father and mother. And there is abundant proof in the record, that *Sam*, one of the young negroes sold to *Stone*, was not held by *J. C. Jones*, under the conveyance from *Clement Smith*, but that he was the *bona fide* owner of him, as a purchaser at a sheriff's sale. So far from allowing any credit to the plaintiff below, on

account of the sale of *George* and *Polly*, the auditor, who will be directed to state an account, according to the views of this court upon the record, as now before it, will be instructed, upon *Barneclo's* testimony, to credit *John C. Jones* with sixty dollars for the maintenance of those negroes.    And it is a matter of great doubt, whether the credit ought not to be for sixty dollars a year, from the 30th of June 1837, until the sale to *Stone*, in 1842.

Several other objections to the auditor's account E, dependent on the facts in the case, have been urged by the plaintiff below, but believing that a due examination of the proof in the cause shews them to be untenable, we forbear to discuss them.

On the part of the plaintiff below, it has been insisted, that the decree of this court on the former appeal, has been misunderstood by the chancellor, in supposing that it authorised allowances to *John C. Jones* for any improvements, other than necessary repairs.    And to prove that such was the meaning of this court, numerous authorities have been referred to, as shewing that such were the only allowances that could legitimately have been made.    For this purpose, the case most strongly relied upon was that of *Moore vs. Gable*, 1 *Johns. C. R.*, 385, where a mortgagee in possession, on a bill by a mortgagor to redeem, was not allowed for clearing wild lands. Chancellor *Kent* there remarks, that "to make the allowance would be compelling the owner to have his lands cleared, and to pay for clearing them, whether he consented to it or not. The precedent would be liable to abuse, and would be increasing difficulties in the way of redemption."  "Lord *Hardwicke*, (in 3 *Atk.*, 517,) there said, that a mortgagee in possession, was not obliged to lay out money any further than to keep the estate in necessary repair."    And chancellor *Kent*, proceeding with his opinion, said, "I shall accordingly direct a master to compute the principal and interest due on the mortgage down to the first of January last, and that, in taking the account, he charge the defendant with the net amount of rents and profits received, except such as shall appear to have exclusively arisen from his own expenditures in improvements ; and that he allow for the expense of necessary reparations, if any, *but not in*

clearing part of the land, and that he report with all convenient speed.'' The condition of the parties in the case before us is, as we shall hereafter have occasion to shew, different from that in the case in 1 *Johns. C. R.*, 385, and therefore under the governance of different principles. But it may not be amiss to observe, that it would be difficult to reconcile, with the broad and liberal principles of a court of equity, the instruction of the learned chancellor, (if intended as of general application,) to charge the defendant with the whole amount of rents and profits, except such as shall appear ''to have exclusively arisen from his own expenditures in improvements.'' If therefore, for example, a mortgagee, (in possession,) of a mill worth ten dollars per annum, by its reconstruction or enlargement, not repair, render it of the annual value of $1000, he is to be charged with the full amount of such enhanced rent, and be allowed nothing for expenditures in the improvement. But if the mortgage be of the mere site of a mill, of no value in its then condition, and the mortgagee build a mill, the annual rent whereof is $1000, an allowance is to be made him out of the rents received for his expenditures in the improvements. If the allowance in the latter case be correct, it is not easily discovered why a proportionate allowance ought not to be made in the former case.

Many other cases were referred to, shewing that allowances for expenditures in repairs ought to be made, but not for expenditures in new improvements. And authorities were referred to, to prove that allowances should be made in both cases. But these were cases of defendants knowingly and avowedly holding as mortgagees or as tenants, after notice to quit; or as trespassers or wrong doers.

In 1 *Pow. Mortg.*, 313, *note (o)*, the learned annotator, after referring to the contradictory decisions as to allowances to tenants for life, or mortgagees in possession, for improvements made by them, states, that ''the old rule would now, perhaps, be considered obsolete, and the tenant for life, or mortgagee, allowed in full for all reasonable and permanent improvements, with interest from the time he made them.'' And in 2 *Pow. Mortg.*, 956, *note (e)*, he says, ''it may be proper in this place

to add, that the mortgagee, in accounting, will be allowed all costs of suit, taxes, renewal fines, sums expended in necessary repairs and lasting improvements.'' The same doctrine has been sanctioned by chancellor *Bland.* See *Hagthrop vs. Hook's adm'rs,* 1 *Gill & Johns.,* 373. But conceding in this case, (what is by no means designed to be generally admitted,) that it is otherwise, and that, as a general rule, mortgagees and tenants for life, rightfully in possession, can only be allowed for expenditures made in necessary repairs, and are entitled to no allowance for those made in lasting improvements; yet this case has in it a discriminating feature, which, in the eye of a court of equity, should entitle the defendant, *J. C. Jones,* to the controverted allowances, designed to be secured to him by the former decree of this court. In 2 *Pow. Mortg.,* 956, *note (e),* it is stated, that "where a mortgagee, *thinking himself absolutely entitled,* had expended considerable sums in repairs and lasting improvements, he was allowed such expenditures.'' And, in page 957 of the same book, it is stated, "it seems that money laid out by a mortgagee in repairs and beneficial improvements, forms a lien on the land; but in ordinary cases, money laid out in improving premises, does not create a lien; yet, if a party, *conceiving himself to be owner,* makes lasting improvements, a court of equity, it is assumed, would not take the estate from him, without compelling the plaintiff to make some allowance for the sum expended in improving the premises.''

In 1 *Story's Rep.,* 494, *Story, J.,* says: '' In cases where the true owner of an estate, after a recovery thereof at law, from a *bona fide* possessor, for a valuable consideration, without notice, seeks an account in equity, as plaintiff, it is the constant habit of courts of equity to allow such possessor, (as defendant,) to deduct therefrom the full amount of all meliorations and improvements, which he has beneficially made upon the estate; and thus recoup them from the rents and profits. So if the true owner of an estate holds only an equitable title thereto, and seeks the aid of a court of equity to enforce that title, the court will administer that aid, only upon the terms, of making compensation to such *bona fide* possessor,

for the amount of his melioration and improvements of the estate, beneficial to the true owner. In each of these cases, the court acts upon an old and established maxim in its jurisprudence, that "he who seeks equity, must do equity." To the benefit of these equitable principles, the defendant, *John C. Jones*, has shewn himself entitled. He purchased in ignorance of any defect of title, though apprized of the claim of the plaintiff below, and took possession, and made the improvements, under the opinion of counsel that the title was clear. All his acts, and the circumstances of the case, demonstrate, that at the time of his purchase, and when the improvements were made, he believed his title to be a good one.

But suppose it were conceded, that where the title is clear at law, and where a claimant, under such a title, goes into equity for an account of rents and profits; or where the right to the interposition of a court of equity, in asserting the title sought to be established, is absolute and unqualified, and subject to no discretion in the court to grant or withhold it, an allowance can only be made to a defendant, possessor, for necessary repairs, and none for new buildings or improvements: yet this case stands unaffected by such a concession. Here, the plaintiff below presents no such absolute, unqualified right to the interposition of a court of chancery. His appeals for relief are addressed to the sound discretion of the court; and the relief sought, may be modified or made conditional, or be wholly denied, as may be consistent with the dictates of equity and conscience. The plaintiff below, seeks to enforce the specific execution of a contract; which is, always, an appeal to the conscience and sound discretion of the court. From such an application, if unconscientiously or unreasonably made, a court of chancery will, either, altogether withhold its relief, or grant it upon such terms as to render it consistent with equity and justice. That such terms would secure to *John C Jones* an allowance for his lasting improvements on the *Clean Drinking* estate, cannot be regarded as a subject for doubt. In such cases, the appropriate enquiry might be, were the improvements made *bona fide*, and without a knowledge of the defect of title? If answered in the affirmative, in the language of

*Justice Story*, they "have permanently enhanced the value of the lands, to the extent of such enhanced value, the plaintiff is bound in conscience to make compensation, *ex æquo et bono*.

The plaintiff below, claims a reversal of the order of the chancellor of the 29th of April 1845, because he has, thereby, ratified the auditor's account E, in which the lasting improvements of *John C. Jones* are charged at their original cost, and not at their actual value at the time of the audit. And to sustain his objection, he has cited *Hagthrop et al., vs. Hook's adm'rs*, 1 *Gill & John.*, 373, wherein chancellor *Bland* uses the following language: "but the estimate of the value of such lasting improvements, is to be taken as they are at the time of accounting or passing the final decree. For such allowances are made upon the ground, that the improvements do, in fact, pass into the hands of the plaintiff as a new acquisition. And they can only be a new acquisition to him, to the extent of their value at the time he recovers or obtains possession of them, and therefore their value, at the time, is to be allowed, and nothing more." This is true or not true, according to circumstances. If property only is recovered, then is the rule, as laid down by the chancellor, equitable and true. But if rents and profits are charged, it is true or false, equitable or inequitable, according to the mode in which such charges are made. If the rents and profits are charged agreeably to the improved value, then is the doctrine unsound and inequitable; if upon the value, independently of the improvements, then is the rule announced by the chancellor equitable and sound.

It is true, in this case the rents and profits have been charged according to the value of the land, before the lasting improvements were made; but to state the account upon the proofs in the cause in any other way than it has been, with any certainty of doing more justice to the parties, was not in the power of the auditor. It was in proof that the enhanced annual value of the estate was in a great measure the result of expenditures, made in the amelioration of the soil, and by the purchase of quantities of manure, gypsum, and clover, and timothy seed, &c., an allowance for which *John C. Jones* would have been entitled, had he been charged with the enhanced rents resulting

from his expenditures for such amelioration. The auditor, therefore, believing that substantial justice would be thereby effected, very properly considered the enhancement of the rents, as a fair offset to the expenditures for amelioration, and allowed nothing for either.

In adopting the proof of the first cost of the improvements, as their value at the time of the audit, the auditor could not have done otherwise: there being an absence of proof before him, of the times at which the improvements were made; of the amount of their depreciation in value; or that they had suffered any such depreciation; or of what their then value was.

On the appeal taken by *John C. Jones*, we think injustice has been done him, in rejecting all allowance for his expenditures in ditching and grubbing the meadow land. From the nature of the services rendered, and the proof in the cause, they were necessary, valuable and lasting improvements, and entitle him, for them, to a fair and equivalent allowance.

This case, on the appeal by *J. C. Jones*, being about to be reversed, the auditor of the court of chancery will be requested to state an account pursuant to the views, and under the direction of this court; upon the report whereof a decree will be passed, disposing of the present appeals, and settling the matters in controversy under them.

DECREE REVERSED WITH COSTS.