WELSH ET AL. *v*. WELSH ET UX.

[No. 335, September Term, 1968.]

*Decided July 11, 1969.*

682

*Motion for rehearing filed August 11, 1969; denied September 8, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SMITH, JJ.

*Horace P. Whitworth, Jr.,* and *Louis A. Fatkin* for appellants.

*John F. Somerville, Jr.* for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal principally involves the question of whether or not the appellees, Harry E. Welsh (Harry) and Elizabeth Welsh, his wife, were bona fide possessors of a tract of land owned by Charles C. Welsh (Charles), one of the appellants, when the appellees erected a substantial portion of a gasoline filling station thereon, so that *the equitable doctrine of melioration would apply.*

One aspect of the present dispute involving an action of ejectment by Charles against Harry and wife in regard to the location of the lines of the adjoining properties was previously before us in *Welsh v. Welsh,* 248 Md. 619, 237 A. 2d 739 (1968). In the ejectment case, the jury had found that the improvements erected by Harry E. Welsh and wife were upon the land owned by Charles C. Welsh and we held that the judgment entered in the ejectment action, considered in light of the charge

to the jury, to which no exception was taken, was sufficiently definite and established the controlling boundary line as that set forth in the 1957 plat prepared by the surveyor, J. Maxwell Mathias. After the return of the mandate from the appeal in the ejectment case, Charles directed the Clerk to issue a Writ of Habere Facias Possessionem to the Sheriff of Allegany County (the other appellant) to place Charles in possession of all the land and improvements located east of the west boundary line established by the ejectment judgment as appearing on the Mathias plat. Harry and his wife then filed the bill of complaint involved in the present appeal on June 18, 1968 praying that (1) Charles' application for a Writ of Habere Facias Possessionem be denied, (2) the lower court appoint a surveyor to determine the true line between the properties of Charles and Harry and his wife, (3) Charles and the Sheriff be enjoined, pending the proceedings, from levying or otherwise executing under the ejectment judgment, (4) the lower court determine the value of the land, if any, belonging to Charles and occupied by Harry and his wife, (5) upon payment by Harry and his wife to Charles of the value of the land so determined, Charles be directed to execute a deed conveying the land to Harry and wife, (6) if Charles refuses to execute the deed, the lower court appoint a trustee to do this and distribute the proceeds and (7) for further relief.

Prior to January 1, 1948, Harry negotiated with Paul B. Gannon, unmarried, who lived in Kentucky at the time, for the purchase of Lots 18, 19 and 20 of Gannon's Addition, Westernport, Maryland. On January 1, 1948, Gannon, for a consideration of $500.00, conveyed all of his right, title and interest in these lots to Harry and wife by a quitclaim deed, duly recorded on January 19, 1948. There were no covenants of title, of warranty or of any other kind in the quitclaim deed. In the ejectment case, the record of which was received into evidence in the present equity suit, counsel for Gannon testified that Harry came to his office and he read the deed to him and

told him the reason for the use of that type of deed. He stated:

"A. What I told Mr. Welsh was that I knew there was a dispute over the lines. I couldn't tell him anything about the title with reference to location of the property. He didn't ask me, of course. He didn't ask me or employ me to search the title to the property. I wasn't representing him. I didn't search the title. Although if I had known or thought—

"(Mr. Ryan) Objection to what he would have done if he had known or thought. We object to what he thought or what he knew.

"(The Court) The objection will be sustained.

"A. So that was the reason I, in order to help my clients out of litigation, the Gannons—

"(Mr. Ryan) We object. We object to what he said about his clients keeping out of litigation.

"(The Court) He is explaining merely there was a quitclaim deed.

"Q. This was fully explained to Mr. Harry Welsh?

"A. Certainly was."

Harry testified in response to a question as to whether or not there were any questions raised "regarding the lines of this property?":

"A. My brother didn't own it at the time.

"Q. Did any one else raise any questions?

"A. He had Mrs. Mason to sort of reject (sic) me building there."

Harry and wife then had Lots 18, 19 and 20 surveyed by Wallace Brown on March 3, 1948. A rather crude plat on a legal size piece of white paper, done in pencil, but signed by Mr. Brown, who affixed his seal as surveyor, was prepared, entitled "Map Showing Compromise Between the Properties of Harry Welsh and J. Mason, West-

ernport, Maryland." This plat was signed by Harry and Mrs. Mason on March 17, 1948. Apparently there was no formal agreement indicating the nature of the settlement or what consideration, if any, there was for such an agreement. From the plat, it would appear that the area in question was a triangular parcel on the northeast portion of Lots 19 and 20, with a base of the triangle of 28.93 feet and bounded by the N. 49° 45′ E. line forming the southeast boundary line of Lot 20 and running to a point at the northeasterly boundary line of Lots 19 and 20, i.e., N. 25° 15′ W. This triangle is hatched in with a red pencil and presumably is the portion of the land in dispute between Mrs. Mason and Harry, although nothing on the plat or in the record indicates which one of the two signers was to receive or own the hatched triangle. There is no indication on this plat of the dividing line ultimately established by the Mathias Plat of 1957 which the jury accepted as the true division line. There is no projection of any buildings or other improvements on the plat.

In June 1949, Philip Hartig, a registered surveyor, made a survey of Lots 18, 19 and 20. There are no courses or distances indicated on this plat. Lots 18, 19 and 20 are marked "Quitclaimed from 'Brickyard'". The southeasterly line of Lot 20 appears to be a projection of the first line of "Good Luck" with a beginning point for that line on the southeasterly line of Lot 20. No structures are indicated anywhere on Lots 18, 19 and 20.

In November 1950 Harry constructed the original service station and building, 28 feet wide and 40 feet long, located principally on what is shown on the prior surveys as Lot 19, but with a small part of the structure extending on to Lot 20.

In July 1953, Mr. Hartig made a second survey and plat apparently for James Welsh, Harry's brother and the predecessor in title of Charles. This second survey plat shows the division line running through the southeast portion of the service station so that approximately one-fourth of it was located on the adjoining land owned by

James Welsh. Inasmuch as the second Hartig plat of July 1953 was introduced into evidence *by Harry and his wife* in the prior ejectment case, it is apparent that they had knowledge of this second survey and had a copy of the plat.

Thereafter on October 26, 1954, James Welsh began an action at law in ejectment (Law No. 529, Circuit Court for Allegany County) disputing the boundary line. On December 6, 1955, Harry and his wife obtained a confirmatory deed from Paul B. Gannon which was duly recorded on December 9, 1955. This confirmatory deed describes as a First Parcel Lots 18, 19 and 20 by metes and bounds; as a Second Parcel refers to land contiguous to and on the south side of Lots 18, 19 and 20 and the edge of the concrete pavement of the State Highway between Westernport and McCoole, being the property conveyed to Harry and his wife by Gannon by a deed dated September 15, 1948 and duly recorded, reference being made to that deed for a more specific description; as a Third Parcel, the land contiguous to the south side of Lot 17 and being between that lot and the concrete pavement of the State Highway between Westernport and McCoole, being the property conveyed to Harry and his wife by Gannon by a deed dated February 1, 1950 and duly recorded, reference being made to that deed for a more specific description. This confirmatory deed conveyed all those parcels to Harry and his wife as tenants by the entireties, and contains a covenant of *general* warranty, a covenant of seisin, a covenant against encumbrances and a covenant for further assurances.

In November 1957, J. Maxwell Mathias, a registered surveyor, made his survey which showed that the dividing line between the property of James Welsh and that of Harry and his wife ran through the service station so that approximately three-fourths of it was on the land of James. This was the plat found by the jury to be the correct plat in the ejectment action involved in *Welsh v. Welsh, supra,* 248 Md. at 622, 237 A. 2d at 741.

On April 6, 1959 the original ejectment action filed by James Welsh on October 26, 1954 was placed on the stet docket and on June 10, 1960 a Motion Ne Recipiatur was filed in that case by Harry and his wife, after which no further action was taken in those proceedings.

In 1962, Harry constructed an addition on the east side of the original structure, consisting of an additional 14 feet, to be used as a service area and an apartment for rental purposes.

James Welsh and wife conveyed their property adjoining the property of Harry and his wife to Charles by a deed which was dated April 1, 1965 and was duly recorded. Two parcels were conveyed, one, the half acre, more or less, described by metes and bounds and formerly owned by Jerentha Mason; the other, the parcel known as "Good Luck" also described by metes and bounds, which contained 20 acres, more or less, also once owned by Mrs. Mason. Charles, on May 25, 1965, filed his declaration in the ejectment action involved in *Welsh v. Welsh, supra,* which, as we have indicated, was concluded in his favor after we affirmed the judgment of the lower court in that case on February 7, 1968.

On May 28, 1968, after the mandate in the ejectment case had been returned to the lower court, Charles directed the Clerk of the Circuit Court to issue to the Sheriff the Writ of Habere Facias Possessionem, as we have indicated, and the present suit in equity was subsequently filed by Harry and his wife.

At the hearing on the merits the above mentioned facts were developed, as well as other facts we shall mention later. Wallace H. Wilson, a real estate appraiser, appointed by the trial court (Getty, J.) gave his opinion that the improvements erected by Harry and his wife upon the land owned by Charles had an approximate value of $21,000. There was testimony offered by Charles that the value was approximately $6,000.

On October 10, 1968, the trial court filed a written opinion indicating that in his opinion Harry and his wife

were bona fide possessors of the real estate of Charles, on which they had erected the substantial part of the service station and building and that the equitable doctrine of melioration should apply. On that date also an order was signed by the lower court providing that Charles, within 10 days, should notify Harry and his wife by registered letter of his option either (1) to accept payment for the lot at its face value without improvements, fixed by the court at $500 or (2) pay to Harry and his wife $20,000 representing additional value conferred upon the lot by the improvements and, depending upon which option Charles exercised, the proper party convey to the other upon payment, the property in question. From this order the present appeal was timely taken.

The appellant, Charles, contends before us that the trial court erred in deciding that—

(1) Harry and his wife were bona fide possessors of the land on which they originally constructed the garage and on which they subsequently constructed additions to the garage and apartments;

(2) The improvements on the real estate added an additional value of $20,000 to the real estate in consideration of all the evidence and circumstances in the case.

We have concluded that the lower court was in error in holding that Harry and his wife were bona fide possessors entitling them to the application of the equitable doctrine of melioration, and we shall reverse the order of October 10, 1968. We find it unnecessary to consider or decide the second ground of error raised by the appellant, Charles.

Maryland follows the general rule in the United States in regard to the equitable doctrine of melioration or compensation for improvements made by a bona fide possessor of land. The general rule is well stated by Professor Tiffany in 2 Tiffany, *Real Property* §625, *Compensation for Improvements,* at 621 (3d Ed. 1939) as follows:

"Since the rule that erections or additions made by one who has no rights to land are fix-

tures, and therefore not removable by him, even though he made them in the belief that he was the owner of the land, is calculated to cause hardships to an innocent occupant of another's land, by giving the benefit of his labor and expenditures to the landowner, the courts of this country, without either imputing fraud or requiring proof of it, hold it inequitable to allow one to be enriched under such circumstances by the labor and expenditures of another who acted in good faith and in ignorance of any adverse claim or title. Applying this doctrine of 'unjust enrichment,' a court of equity will, on the principle that he who seeks equity must do equity, refuse its assistance to the rightful owner of land as against an occupant thereof unless he makes compensation for permanent and beneficial improvements, made by the latter without notice of the defect in his title."

It will be observed that the occupier of the land of another in order to have the equitable doctrine apply, must have acted in good faith in making the improvements and must be ignorant of any adverse claim on the title. This requirement is not satisfied in situations in which the occupier of the land has actual knowledge of an adverse claim to the title or in which he has knowledge of facts which, as a reasonable man, would require him to investigate and discover such an adverse claim.

It will also be noted that the basis of the equitable jurisdiction is to prevent unjust enrichment for which there would be no adequate remedy at law, where the rule *"Quicquid plantatur solo, solo cedit"*—whatever is attached to the soil, belongs to the soil—would be strictly applied by the law courts.

As early as 1793, at the May Term of that year, the General Court of Maryland, in *Quynn v. Staines*, 3 H. & McH. 128, affirmed the decree of the County Court giving *affirmative* relief in equity for L150, the value of im-

provements put on another's land by a bona fide possessor, and itself gave the same affirmative relief in a bill in equity filed in the General Court. This case, however, was not appealed to the Court of Appeals. In *Hagthorp v. Hook,* 1 G. & J. 270 (1829), Chancellor Bland indicated that the value of improvements erected by a bona fide mortgagee in possession (the deed having been declared by the Chancellor to be a mortgage) should be allowed, but indicated in rather broad language that their value would be taken at the time of the accounting or the passage of a final decree. The appeal taken to this Court was dismissed as premature and the merits were not discussed by the Court of Appeals. In *Jones v. Jones,* 4 Gill 87 (1846), however, the Court again reaffirmed the propriety of making an allowance to a bona fide possessor for the value of permanent improvements to the land, referred critically to the language of Chancellor Bland in *Hagthorp v. Hook, supra,* and enunciated the proper rule in regard to making the valuation. (4 Gill at 104). In *McLaughlin v. Barnum,* 31 Md. 425 (1869), Judge Miller, for the Court reviewed the prior Maryland cases and authorities generally and announced the applicable law as follows:

> "All that is required to entitle a defendant to claim this equity is that he be a *bona fide* occupant or possessor, and not a mere *tort feasor* or *mala fide* intruder, holding with full knowledge of his own position and of the adverse claim. The Supreme Court, in *Green v. Biddle,* 8 Wheat. 79, have defined a *bona fide* possessor, according to the doctrine of the civil law, to be one 'who not only supposes himself to be the true proprietor of the land, but who is ignorant *that his title is contested* by some other person claiming a better right to it.'" (Emphasis in the original, 31 Md. at 453-54).

The Court, however, expressed doubt that equitable relief could be granted affirmatively by a bill of complaint

directed to that end, but declined to pass upon that issue as it was not before the Court. In *Union Hall Ass'n v. Morrison,* 39 Md. 281 (1874), this Court specifically considered the question not decided in *McLaughlin* and decided that affirmative relief by a bill in equity by a bona fide occupant of land, without notice of a defect in his title, could be maintained against the true owner of the land for the value of the improvements made to the land by the occupant, after the true owner had prevailed in an action of ejectment and issued a writ of *habere facias possessionem.* See *Goldberg v. Ford,* 188 Md. 658, 53 A. 2d 665 (1947) ; *Warwick v. Harvey,* 158 Md. 457, 148 A. 592 (1930) ; *Broumel v. White,* 87 Md. 521, 39 A. 1047 (1898) *; Eichelberger v. Hawthorne,* 33 Md. 588 (1871) ; and *Tongue v. Nutwell,* 31 Md. 302 (1869). See also the excellent review of Maryland cases on this subject by Professor Brantly in his comprehensive note to the case of *Jones v. Jones, supra,* 4 Gill at 87-90, cited with approval and quoted in part by the Court in its opinion in *Warwick v. Harvey, supra,* 158 Md. at 461, 148 A. at 594. See generally 5 American Law of Property § 19.9 at 34-37 (1952), Restatement, *Restitution,* §§ 40, 42 and 53 (1937).

The trial court in considering the question of whether or not Harry and his wife were bona fide possessors stated :

"I find from the testimony that the Plaintiffs encroached upon the land of the Defendant innocently and in good faith. This is supported by evidence that at least two surveys were made before construction was undertaken, and previously litigation filed by the Defendant's predecessor in title had been stetted whereby the Plaintiffs herein could reasonably conclude that no further claim to the property would be made. The Court concludes, therefore, that the Plaintiffs herein are entitled to relief as bona fide possessors; * * *"

We do not agree with the Chancellor's conclusion, and are of the opinion that it is clearly in error.

As we have indicated, under the authorities cited, a person to be a bona fide possessor must not only believe that he has title to the property but it must appear also that he has had no notice of an adverse claim of title by another person or of facts which would require an investigation that would lead to a discovery of the adverse claim. In our opinion, from the evidence in the case, Harry knew of the existence of an adverse claim of title or, at the least, knew of facts which required an investigation of such a claim. When Harry and his wife originally purchased Lots 18, 19 and 20 from Gannon in 1948. Harry knew from counsel for Mr. Gannon that he was receiving a quitclaim and not a warranty deed. Counsel for Gannon advised Harry that he (counsel) "knew there was a dispute over the lines. I couldn't tell him anything about the title with reference to location of the property." [1] Counsel for Gannon also testified that the deed was merely a quitclaim deed and "this was explained fully to Mr. Harry Welsh." In addition to this, there had been bitterness and illwill between the brothers Harry and James for many years and Harry, himself, testified that, in regard to this service station building, his brother James had for 19 years "been bugging me about this place." He further stated that his brother "told somebody. that if I built a service station there he would run coal down through it." Harry also testified that his brother, James, had stirred up Mrs. Mason to stop his construction of the service station. As we have indicated, the Brown survey and crude map, signed by Mrs. Mason and Harry, did not concern itself with division lines ultimately established by the Mathias Plat of 1957, but was concerned with a triangular portion of the northeast section of Lots 19 and 20.

---

1. As appears from the full quotation, given earlier, the objection of counsel for Harry was not to this portion of the answer but related to a later portion of the answer, which did not come into evidence. The portion of the answer quoted was not stricken out and was not contradicted by Harry.

On cross-examination, Harry testified in regard to the claim of Mrs. Mason:

"Q. Mr. Welsh, isn't it true though that at the time you made your first construction there in 1949 I believe you said, didn't you know that there was some dispute over the lines at that time? A. There was nothing wrong, my brother caused the trouble through Mrs. Mason. He had her believing that I was going to close the road and all that sort of stuff.

\* \* \*

"A. She claimed if I would let her use the road, she was afraid the road would be closed because this far corner of 20 went across the road about eight feet.

"Q. Then Mrs. Mason did recognize that there was some discrepancy between the lines between her property and what you say you purchased? A. No, she just sort of claimed there was.

"Q. Claimed there was? A. Yeah.

"Q. Well then she thought there was, it was her property too. A. If you know my brother, he put her up to it, see what I mean. He even told her that if I build anything on those lots he would run coal down through it."

The first Hartig Plat of June 1949 labels Lots 18, 19 and 20 as "Quitclaimed from 'Brickyard' ", but indicates no courses and distances and shows the southeasterly line of Lot 20 as a projection of the first line of "Good Luck" with a beginning point for that line on the southeasterly line of Lot 20.

In testifying in regard to the first survey made by Philip Hartig, Harry significantly testified:

"Q. Was this survey made before any improvements were constructed on the premises? A. Yes, I had taken some dirt out before Phil

was finished surveying, and we stood on the bank and I said, 'Now Phil, if I put a building on here everything will be all right.' He said, 'Harry,' he said, 'to change anything here they'd have to be a lot of disproving because,' he said, 'you have that military lot line there as a definite point in the lots, a definite starting point.'"

This testimony in itself indicates that there was some question in regard to the line in Harry's mind and further that Mr. Hartig's reply was far from reassuring when he said there would have to be "a lot of disproving," rather than a direct and categorical statement that the lines indicated on the plat were definitely correct and that Harry would be safe in erecting the service station building at the proposed location.

Harry and wife then built the original service station in November 1950, notwithstanding his knowledge of his brother's statement, of Mrs. Mason's claim in regard to Lot 20 and that they were possessors of a quitclaim deed, with the explanation of counsel for the seller already set forth.

Thereafter, Hartig made a second survey in July 1953, apparently for James, which showed the boundary line running through a portion of the original service station building. As we have indicated, Harry and his wife must have had notice of the existence of this plat as *they* introduced it into evidence in the ejectment action initiated by Charles and previously passed upon by us.

Still later, James instituted an ejectment action against Harry and his wife on October 26, 1954. Harry and his wife then obtained the confirmatory deed of December 9, 1955 from Gannon, but this deed contained the identical metes and bounds, courses and distances as the original quitclaim deed so far as Lots 18, 19 and 20 were concerned and merely referred to prior deeds from Gannon to Harry and his wife for the descriptions for the other parcels. The confirmatory deed did contain a covenant of

*general warranty,* but apart from that, appears to accomplish nothing so far as Lots 18, 19 and 20 were concerned, that had not been accomplished by the original quitclaim deed.

It is correct, as the Chancellor observed, that the ejectment action instituted by James was placed on the stet docket, but we cannot agree with his statement that Harry and his wife "could reasonably conclude that no further claim to the property would be made." The law is clear that a stet in either a criminal or in a civil case does not dispose of the case, and it can be removed from the stet docket and brought to trial at a later time. See *Williams v. State,* 204 Md. 55, 64-65, 102 A. 2d 714 (1954) ; *Crawford v. Richards,* 193 Md. 236, 66 A. 2d 483 (1949). See also 22A C.J.S., *Criminal Law* § 456 at 1 (1961). Harry testified on cross-examination that he expected his brother to take further proceedings in regard to the title. He stated :

> "Q. Didn't you also state in your former testimony, if you recall, I have it here I can read it to you. You say that, 'I have been bugged for practically nineteen years, he has been bugging me about this place.' A. In more ways than one.
>
> "Q. That's true? So then isn't it true that at the time you built this second addition you still knew at that time that the property upon which you were building this garage was in dispute? A. Well I thought he'd start on something else then, because that was dead see. I was advised that. Cause he don't let up."

Notwithstanding that knowledge, Harry and his wife proceeded to erect an addition, 14 feet by 28 feet, to the original service station building which further encroached on the adjoining land.

It is well established that the institution of an action of ejectment by an adjoining property owner, even though the occupiers of the land believe it to be without merit, is sufficient to put the occupiers on notice of an adverse

claim and they thereafter erect improvements at their peril. *Vernon v. McEntire,* 234 Ark. 995, 356 S.W.2d 13 (1962) ; *Glassburner v. Burtrum,* 418 S.W.2d 119 (Mo. 1967) ; Cf. *Eppenauer v. Ohio Oil Co.,* 128 F. 2d 363 (5th Cir. 1942).

In our opinion, the above facts indicate that Harry and his wife were put on notice that there was a claim to part of the land they originally acquired by the quitclaim deed from Gannon. They did not obtain a certification from counsel in regard to the title, they obtained no title insurance, and they did not, as occupiers of the land, file a bill, *quia timet,* to quiet their title before they proceeded to build the improvements on the land. They were not, under the circumstances, bona fide possessors as defined by the authorities mentioned and are not, in our opinion, entitled to any compensation for the improvements they made on Charles' land at their own risk.

*Order of October 10, 1968 reversed, and case remanded to the lower court with directions to enter an order dismissing the bill of complaint, with prejudice, the costs to be paid by the appellees.*